Nemesio D. DOMINGO, Jr.; Samuel Cabansag, Jr.; Joseph C. Ancheta; Thomas G. Carpenter and Terri Jane Mast, as administrator of the estate of Silme G. Domingo; Nellie Kookesh; Audrey A. Merculief; Frank Paul; Mary Paul; Tony Evon, Sr.; and Samuel Strauss, Plaintiffs-Appellants/Cross-Appellees,

v.

NEW ENGLAND FISH COMPANY, and Nefco Fidalgo Packing Co., Defendants-Appellees/Cross-Appellants.

Nos. 81–3702, 82–3026, 82–3027 and 82–3035.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 10, 1982.

Resubmitted March 17, 1983.

Decided March 13, 1984.

Abraham A. Arditi, Northwest Labor & Employment Law Office, Seattle, Wash., Craig Tillery, Alaska Legal Service Corp., Anchorage, Alaska, for plaintiffs-appellants/cross-appellees.

Michael Dundy, Bogle & Gates, Anchorage, Alaska, for defendants-appellees/cross-appellants.

Before CHOY and FLETCHER, Circuit Judges, and MacBRIDE,* District Judge.

* The Honorable Thomas J. MacBride, Senior United States District Judge for the Eastern District of California, sitting by designation.

PER CURIAM:

Nemesio Domingo, a Filipino, is a named plaintiff in a class action suit against his former employer, New England Fish Co. ("Nefco"). Domingo charged Nefco with employment discrimination on the basis of race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Civil Rights Act of 1866, 42 U.S.C. § 1981. Following a bifurcated trial, the district court found for plaintiffs and awarded classwide and individual damages. We affirm in part and reverse in part.

I. *Background*

As the facts of this case are reported more fully in the district court opinion, *Domingo v. New England Fish Co.,* 445 F.Supp. 421 (W.D.Wash.1977), they only will be summarized here. Nefco operates salmon canneries located in remote, widely separated areas of Alaska. The facilities operate for only a limited period each year—typically less than 2 months—and lie vacant for the remainder of the year. Nefco hires employees from various areas of Alaska and from Washington, Oregon, and northern California. It transports the employees to the canneries and houses and feeds them throughout the canning season. Employees are hired in a number of capacities, ranging from cannery workers and general maintenance personnel to administrators and engineers.

A. *Statistics and Hiring Policies*

According to statistics compiled by Domingo and not challenged by Nefco, Nefco's work force was 47% nonwhite overall. However, nearly half of Nefco's hirings by job titles were racially segregated; in certain jobs 90% or more of the employees were white, while in others 90% or more were nonwhite. Many of the higher-paying job classifications were predominantly white, including jobs in the administrative department (100%), the tender department (96%), the quality control department (93%), and the machinist department (90%). The largest and lowest paying department, the cannery department, was 76% nonwhite.

The district court found that several company records labeled work crews by race. Time sheets contained job titles such as "Fil.[ipino] Crew—1st Foreman," "Fil. Crew —Inspector," "Native Cannery Foreman," or "White Bull Cook." Racial labels were also found in computer ledgers at Nefco's home office, on internal memoranda, and on budget forms prepared by cannery superintendents.

Nefco hired employees for each job department through separate channels. For the lower-paying cannery worker jobs, for example, Nefco recruited workers from native villages in Alaska and through a primarily Filipino ILWU local in Seattle. The resulting work force in the cannery department was almost entirely Alaska Native and Filipino. In contrast, the machinists and beach gangs were recruited by word of mouth. Friends and relatives of employees in those departments were thus the first to receive word about vacancies in the department. As the people in those departments were mostly white and the foremen who did the recruiting were white, most of the employees recruited were also white.

In addition, Nefco gave preference in hiring to relatives of company employees and business associates. This pervasive nepotism policy did help both whites and nonwhites obtain employment, but whites controlled the best jobs, and in those jobs the nepotism favored whites.

Finally, Nefco's criteria for employment were almost entirely subjective. The only criteria were: (1) job-related experience, (2) reputation for being a good worker, and (3) compatibility; even these criteria were not always adhered to. Each hiring decision was made by a cannery superintendent or a foreman on the basis of his personal judgment. Almost without exception, the hiring foremen and superintendents were white.

In order to justify its hiring decisions, Nefco introduced written job descriptions which purported to describe the necessary qualifications for many of its skilled jobs. However, the district court found that these job descriptions were largely pretextual

since a number of Nefco's skilled employees could not meet the qualifications listed in the job descriptions as of the time they were hired.

### B. *Housing and Mess Halls*

Although Nefco claimed that housing was assigned on the basis of crew and date of arrival at the cannery, employees found themselves in buildings that were either largely or entirely segregated. Even when integrated crews were assigned to the same bunkhouse, the floors of the bunkhouse were segregated by race. The best housing was assigned first and the worst assigned last, but the machinist, tender, carpenter, and other crews in which whites predominated were generally brought to the facilities first. The cannery crew (76% non-white) was generally the last to arrive.

Domingo also alleged that Nefco maintained segregated eating facilities at its canneries. However, Nefco did not assign seating in mess halls. In some of the mess halls, signs proclaimed that there were no seating restrictions. Generally, two types of food were served in the mess halls: American and Oriental. The Oriental food was provided at the request of Local 37, a Filipino union. At some of the canneries, the American and Oriental messes were in two different buildings. The Oriental mess was frequented mainly by Filipinos, and was known as the "Filipino mess." However, any employee could eat in either mess hall if he notified the cook in advance and if there was enough food and space to accommodate him. At other canneries, American and Oriental food was served in the same building. Employees usually sat at segregated tables because crews that worked and

1. The procedural history of the case in the interim between the time of the liability decision and the time of the damages hearings is quite extensive. After finding liability, the district court denied injunctive relief and appointed a monitor to gather information and review Nefco's employment practices. In January 1979, the court denied a preliminary injunction after reviewing the monitor's findings. Domingo took an interlocutory appeal. In May 1979, this court vacated the judgment and remanded for an immediate hearing on injunctive relief.

slept together generally ate together as well.

### C. *Procedural History*

In this lawsuit, the district court certified Domingo's class as that of all nonwhites employed or deterred from employment at any one of five Nefco facilities at any time from January 30, 1971 to November 8, 1976. The court then bifurcated the trial, intending to determine liability on a classwide basis and damages individually. The liability phase of the trial occurred in November 1976, lasting 1½ days. Most of the evidence presented during this phase was in written form.

In the court's reported opinion on liability, the district court found that plaintiffs had established an unrebutted prima facie case of discriminatory employment practices in job allocation and in housing, and that plaintiffs had failed to establish a prima facie case of discrimination in messing.

Following the entry of the liability opinion,[1] individual notice and a claim form were mailed to 780 individuals. Notice was also published in a number of newspapers in Alaska, Washington, and California, and radio broadcasts in English and Yupik were made to native villages in Alaska. In the interim between the liability and the damages phases of the suit, however, the district court placed several restrictions on communications between class members and Domingo and his counsel. The notices did not include the name, address, or telephone number of Domingo's counsel. The court offered claimants the services of four magistrates to assist in filing claims, and it permitted Domingo and his counsel to assist class members in filing claims only when

A couple of weeks later, the court withdrew that order, set the appeal for an expedited hearing, and remanded for entry of findings and conclusions. The court delayed submission of the appeal, which was later dismissed as moot in June 1980, when Nefco petitioned for relief under the Bankruptcy Code. Domingo removed the case to bankruptcy court. At the request of Nefco's trustee in bankruptcy, the case was remanded and the automatic stay lifted.

the class members initiated the contact. During some portion of the time before the damages hearings, the district court prohibited Domingo's counsel from interviewing claimants without giving Nefco's counsel the opportunity to attend and ask questions.

Claim forms were received from 205 individuals. Twelve were not members of the class. The district court dismissed the claims of 19 others before counsel had any contact with them. Thirty-one withdrew their claims.

Ultimately, 124 claims were heard by the district court. The court in November 1981 awarded individual damages to eight of the 124 claimants, and in addition made a lump-sum award of $55,000 in back pay to compensate for disparities in housing quality.[2]

## II. Liability for Discrimination in Hiring and Promotion

The courts have devised two different models to analyze claims of employment discrimination under Title VII. The disparate impact model is used where the plaintiff claims that some facially neutral employment practice has a significantly disproportionate impact on a group protected by Title VII. *Moore v. Hughes Helicopters, Inc.,* 708 F.2d 475, 481 (9th Cir.1983); *Heagney v. University of Washington,* 642 F.2d 1157, 1163 (9th Cir.1981). Once the plaintiff has made a prima facie showing of the existence and impact of such a practice, the burden shifts to the employer to justify the practice as having a manifest relationship to the employment. *Connecticut v. Teal,* 457 U.S. 440, 446, 102 S.Ct. 2525, 2530, 73 L.Ed.2d 130 (1982); *Griggs v. Duke Power Co.,* 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158 (1971). If the defendant meets this burden, the plaintiff must respond by showing that a less discriminatory employment practice is available, *Dothard v. Rawlinson,* 433 U.S. 321, 329, 97 S.Ct. 2720, 2727, 53 L.Ed.2d 786 (1977), or that the practice was a pretext for discrimination, *Teal,* 457 U.S. at 447, 102 S.Ct. at 2531.

The disparate treatment model is used where the plaintiff claims that an employer is intentionally discriminating against individuals protected by Title VII. Unlike a disparate impact case, the plaintiff in a disparate treatment case must show the employer's intent to discriminate, but intent may be inferred from circumstantial evidence. *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977); *Heagney,* 642 F.2d at 1163. Once the plaintiff establishes a prima facie case of the employer's intent to discriminate, the employer must come forward with evidence of a legitimate, nondiscriminatory reason for the disparate treatment. The plaintiff may then seek to show that the proffered reason is merely pretextual. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 254–56, 101 S.Ct. 1089, 1094–95, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973).

Nefco challenges the district court's finding that Nefco discriminated on the basis of race, on the grounds that (1) the district court erred in analyzing Domingo's claims of discrimination under a disparate impact model; (2) it was inappropriate for the district court to base its finding of liability on general comparative statistics; and (3) Nefco successfully rebutted Domingo's prima facie case of discrimination. We hold that the plaintiffs established intentional discrimination; therefore, we need not decide the adequacy of the impact case. Nefco's other contentions are without merit.

### A. Disparate Impact and Disparate Treatment

The district court identified four employment practices which it found had a disparate impact on minorities: use of separate hiring channels for different job categories; word-of-mouth recruitment; nepotism; and vague, subjective hiring criteria. 445

---

**2.** This sum was to be distributed among class members on a pro-rata basis, according to the number of days spent at Nefco's canneries from 1971 through 1976. Any money not dis-

tributed would be divided between a charitable organization for the benefit of Alaska natives and one for the benefit of Filipinos.

F.Supp. at 434–46. Defendants contend that such employment practices cannot be used to prove disparate impact.[3]

■ We agree with Nefco that a disparate treatment analysis may have been the more appropriate approach in this case, but only because Nefco's hiring practices were not facially neutral. Nefco recruited most of its cannery workers through a Filipino-dominated union and from Alaska native villages. These workers comprised its "native crew" and its "Filipino crew." Nefco recruited workers for its other positions, including administrative and clerical workers, machinists, and other departments by word of mouth, mainly from Seattle. The district court found that nearly all the superintendents, foremen, and captains who did this recruiting were white. Priority was given to friends and relatives. Predictably, nearly all of those hired were white. 445 F.Supp. at 435. Under these circumstances, the absence of objective hiring criteria provided a ready mechanism for discrimination. *See Rowe v. General Motors Corp.,* 457 F.2d 348, 359 (5th Cir.1972). These facts, combined with Nefco's use of racial labels for certain job categories and evidence of specific acts of discrimination, established intentional employment discrimination.

### B. *Comparative Statistics*

■ Nefco challenges the district court's reliance on statistics comparing the racial composition of the various job categories of its workforce on the ground that they do not show the percentage of minorities quali-

fied to perform the jobs at issue. In many cases, it is necessary to consider the qualifications of the applicant pool because without that information, no inference of discrimination may be drawn; the lack of minority representation in the workforce might simply be due to a lack of qualified applicants. *See, e.g., Hazelwood School District v. United States,* 433 U.S. 299, 308 n. 13, 97 S.Ct. 2736, 2742 n. 13, 53 L.Ed.2d 768 (1977). In this case, plaintiffs presented sufficient evidence of discriminatory treatment, as discussed above. The workforce statistics were not necessary to raise an inference of discrimination. They merely demonstrated the consequences of Nefco's discriminatory hiring practices. We therefore find no reversible error in their use.

### C. *Business Justification*

Nefco argues that it successfully rebutted Domingo's prima facie case of discrimination by showing that its hiring criteria met the business necessity test and presented a legitimate reason for any disparate treatment. This argument is based on Nefco's showing that hiring was done solely on the basis of whether the applicant possessed the requisite skills, training, and experience to perform the job. This claim is without merit.

■ The district court's liability opinion contains language indicating that the court was not convinced that many of the positions were indeed skilled positions. For example, the district court noted that prior to this litigation, Nefco had neither written

---

**3.** We have recognized that the use of subjective hiring criteria, which "provide a convenient pretext for discriminatory practices," ordinarily lends itself to disparate treatment rather than disparate impact analysis, *Moore v. Hughes Helicopters, Inc.,* 708 F.2d at 481, but there are situations in which disparate impact analysis would be appropriate.

This circuit has recognized that nepotism is a legitimate subject for attack under disparate treatment analysis. *Gibson v. Local 40, Supercargoes and Checkers,* 543 F.2d 1259, 1268 (9th Cir.1976). The Fifth Circuit has pointed out that a system of word-of-mouth recruitment is not one to which the disparate impact model has traditionally been applied. *Pouncy v. Prudential Insurance Co. of America,* 668 F.2d 795,

801 (5th Cir.1982). However, disparate impact analysis was not appropriate in *Pouncy* because of the absence of proof "that the disparate impact is caused by one or more of the challenged employment practices." *Id.* at 801–02. In this case, we have such proof. The district court specifically found that those recruiting for certain positions were, almost without exception, white and that those they recruited were white. Nefco recruited workers for the low-paying cannery positions, on the other hand, through Alaska native villages and the Filipino-dominated union. The causal connection between the challenged hiring practices and the resulting lack of minority workers in certain job categories therefore is quite clear.

nor unwritten job descriptions and that many of the persons actually employed by Nefco in the allegedly skilled positions could not, at the time of their hire, meet the qualifications set forth in the job descriptions Nefco prepared for litigation. 445 F.Supp. at 437. Substantial evidence supports the district court's conclusion that Nefco's asserted requirements of skills, training, and experience were largely pretextual.[4] Moreover, these asserted skills requirements do not present a legitimate, nondiscriminatory reason justifying either separate hiring channels or nepotism.

Thus, the district court did not err (let alone clearly err) in finding that plaintiffs' prima facie case of discrimination was not adequately rebutted by Nefco.

### III. Liability for Discrimination in Housing and Messing

#### A. Housing

█ Nefco does not challenge on cross-appeal the district court's finding that housing was segregated. Nefco does assert that the district court was clearly erroneous in concluding that housing provided to non-whites was inferior. At the damages trial an expert for the plaintiffs testified that nonwhites occupied approximately one-half of the space and facilities allocated to whites. However, the expert made many rash assumptions, as the damages opinion indicates,[5] and the district judge properly

discounted those findings. The district court did find evidence of "squalor, stenches, peeling paint, unsanitary conditions, and defective plumbing" in the nonwhite housing, *Damages Op., supra* note 5, at 39, as well as less protection from the weather. 445 F.Supp. at 438. The district court's finding as to liability for housing discrimination was not clearly erroneous.

#### B. Messing

Domingo argues that the district court erred in dismissing claims of messing segregation. The district court dismissed the claims on the ground that Nefco did not assign its employees to mess halls or dining areas and, therefore, was not directly responsible for any segregation in messing. 445 F.Supp. at 441.

Domingo cites a number of cases holding that an employer is responsible under Title VII for discrimination by its employees, even where the employer does not play a role in creating the discrimination. In *Firefighters Institute for Racial Equality v. City of St. Louis,* 549 F.2d 506 (8th Cir.), *cert. denied,* 434 U.S. 819, 98 S.Ct. 60, 54 L.Ed.2d 76 (1977), the Eighth Circuit held the City was liable for a Title VII violation because it did not prevent its personnel from using its cooking facilities for "supper clubs," many of which excluded Blacks. *See also Taylor v. Jones,* 653 F.2d 1193, 1198–99 (8th Cir.1981) (employer violates Title VII by tolerating work environment

---

4. Nefco argues that the need for special qualifications for some job classifications was obvious as a matter of law from the job titles. *Moore v. Hughes Helicopters, Inc.,* 708 F.2d 475, 483 (9th Cir.1983). Alternatively, Nefco seems to contend that in light of Nefco's presentation of evidence of skill requirements, Domingo had the burden of proof to establish that the jobs in question were unskilled positions. However, we do not think that the skilled job titles require, as a matter of law, the qualifications which Nefco urges upon us. To the extent that job qualifications are not manifest as a matter of law, it is the defendant's burden to show the need for those qualifications. *See id.* at 483. Moreover, where hiring and promotion criteria are subjective and, consequently, unknown to a large extent, it is unrealistic to place the burden on the plaintiff class to show that its members met the job qualifications the company later decided to im-

pose. *O'Brien v. Sky Chefs, Inc.,* 670 F.2d 864, 867 (9th Cir.1982).

5. But plaintiffs' averages disregard many mitigating factors. At some canneries, white facilities were more crowded than some nonwhite facilities. Plaintiffs' expert used square footage tables supplied by the plaintiffs, which omitted many buildings from their figures. The expert assumed the ratios for the unlisted structures would be approximately the same. The expert also assumed that the rental rates charged to fishermen were for average housing rather than "white" housing. These assumptions are rejected because plaintiffs have the burden of proof on damages.
*Domingo v. New England Fish Co.,* No. CV 713–73 C2, at 40 (W.D.Wash. Nov. 19, 1981) (opinion on damages phase) [hereinafter cited as *Damages Op.*].

where black workers subjected to degrading racial jokes and slurs); *Bundy v. Jackson,* 641 F.2d 934, 943 (D.C.Cir.1981) (agency liable for sexual harassment by agency supervisors where agency officials had notice of harassment and did nothing to prevent it).

*Firefighters, Taylor,* and *Bundy* are simply inapplicable to the facts of this case. Plaintiffs make no allegation that class members were excluded or discriminated against by their coworkers. Employees may have sat together in segregated groups, but there is no evidence they did not choose to do so. The only possible basis for Title VII liability here is that Nefco created the conditions that led to self-segregation in messing by its impermissible conduct in segregating working and living groups.

We need not reach the question of whether Nefco's actions were a sufficiently direct cause of the messing segregation to constitute a separate Title VII violation because there is no longer a remedy available for such a violation. In *Firefighters,* the Eighth Circuit ordered the City to promulgate regulations prohibiting use of its facilities by racially-exclusive eating groups. Because the Nefco canneries involved in this litigation are no longer in operation, injunctive relief is not available. Title VII allows monetary relief only in the form of backpay. *See Padway v. Palches,* 665 F.2d 965, 968 (9th Cir.1982). Because plaintiffs have not shown that any minority group received an inferior quality food as compared to that received by other groups, we have no basis for an award of damages.

### C. *Housing Discrimination Under 42 U.S.C. § 1981*

Domingo contends that the district court erred in dismissing the plaintiffs' claim under 42 U.S.C. § 1981 for housing discrimination. The district court held that the plaintiffs had not produced sufficient evidence of intent to prove a violation of section 1981, noting that "most of the housing discrimination is an incidental consequence of the hiring discrimination." *Damages Op., supra* note 5, at 36.

First, proof of intent to discriminate is necessary to establish a violation of 42 U.S.C. § 1981. *General Building Contractors Association v. Pennsylvania,* 458 U.S. 375, 390–91, 102 S.Ct. 3141, 3149–50, 73 L.Ed.2d 835 (1982); *Williams v. Owens-Illinois, Inc.,* 665 F.2d 918, 928 (9th Cir.), *cert. denied,* 459 U.S. 971, 103 S.Ct. 302, 74 L.Ed.2d 283 (1982); *Craig v. County of Los Angeles,* 626 F.2d 659, 668 (9th Cir.1980), *cert. denied,* 450 U.S. 919, 101 S.Ct. 1364, 67 L.Ed.2d 345 (1981). Intent may be proved by circumstantial evidence, such as a pattern of conduct unexplainable on grounds other than race. *See Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 266, 97 S.Ct. 555, 564, 50 L.Ed.2d 450 (1977). Here, the district court specifically found that Nefco's company records referred to the bunkhouses in racial terms. The district court also found that Nefco's contention, that crews were assigned to bunkhouses based on crew and date of arrival at the cannery, was not credible since Nefco assigned members of the same crew to bunkhouses and to floors within bunkhouses by race. 445 F.Supp. at 439. The district court's conclusion that plaintiffs had not proved sufficient evidence of intent since "most of the housing discrimination is an incidental consequence of the hiring discrimination" is clearly erroneous in view of these facts.

### IV. *Communication Restrictions*

Plaintiffs contend the district court's imposition of restrictions on communications between potential class members and the plaintiffs and their counsel is error. They contend the restrictions violate Federal Rule of Civil Procedure 23, as interpreted by the Supreme Court in *Gulf Oil Co. v. Bernard,* 452 U.S. 89, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1981).

The restrictions in this case were imposed under Local Rule 23(g), which prohibits parties and their counsel in a class action from communicating with actual or potential class members without prior approval of the court.[6] Plaintiffs contend the

---

6. *Prevention of Potential Abuses of Class Actions*

following restrictions, imposed before the damages phase of the trial, require reversal of the district court's denial of backpay awards to the majority of claimants: (1) plaintiffs' counsel was denied the right to interview back-pay claimants outside the presence of Nefco's counsel; (2) counsel was prohibited from interviewing 19 claimants before their claims were dismissed; (3) the court limited the ability of plaintiffs and counsel to assist class members in filing back-pay claims; and (4) the court refused to identify plaintiffs' counsel in the notice, making it difficult for class members to direct inquiries to them. We hold the trial court erred in imposing these restrictions and remand for a new hearing on the claims of class members who wish to refile their claims or to file new ones.

In *Gulf Oil,* the Supreme Court held that a district court may not routinely restrict communications between class members and plaintiffs or their counsel. Before such restrictions may be imposed, the district court must carefully weigh the competing interests involved—the need for the restriction and the interference with the rights of the parties—and make specific findings that reflect that weighing. 452 U.S. at 101, 101 S.Ct. at 2200. The Court found the restrictions imposed in *Gulf Oil* were inconsistent with Rule 23 because they made it more difficult for the class representatives to obtain information about the merits of the case and interfered with efforts to inform potential class members of the existence of the law suit. *Id.*

It is undisputed that the district court did not make the specific findings required by *Gulf Oil.*[7] The record contains

In every potential and actual class action under Rule 23, F.R.Civ.P., all parties thereto and their counsel are hereby forbidden, directly or indirectly, orally or in writing, to communicate concerning such action with any potential or actual class member not a formal party to the action without the consent of and approval of the communication by order of the Court. Any such proposed communication shall be presented to the Court in writing with a designation of or description of all addressees and with a motion and proposed order for prior approval by the court of the proposed communications and proposed addressees. The communications forbidden by this rule, include, but are not limited to, (a) solicitation directly or indirectly of legal representation of potential and actual class members who are not formal parties to the class action; (b) solicitation of fees and expenses and agreements to pay fees and expenses, from potential and actual class members who are not formal parties to the class action; (c) solicitation by formal parties to the class action of requests by class members to opt out in class actions under subparagraph (b)(3) of rule 23, F.R. Civ.P.; and (d) communications from counsel or a party which may tend to misrepresent the status, purposes and effects of the action, and of actual or potential Court orders therein, which may create impressions tending, without cause, to reflect adversely on any party, any counsel, the Court, or the administration of justice. The obligations and prohibitions of this rule are not exclusive. All other ethical, legal and equitable obligations are unaffected by this rule.

This rule does not forbid (1) communications between an attorney and his client or a prospective client, who has on the initiative of the client or prospective client consulted with employed or proposed to employ the attorney, or (2) communications occurring in the regular course of business or in the performance of the duties of a public office or agency (such as the Attorney General) which do not have the effect of soliciting representation by counsel, or misrepresenting the status, purposes or effects of the action and orders therein.

Local Rule 23(g), Western District of Washington. This rule is based on the model provided in the Manual for Complex Litigation (rev. ed. 1973).

7. Nefco suggests that because *Gulf Oil* was decided after the restrictions in this case were imposed, it should not control our decision.

A reviewing court generally must apply the law as it exists at the time of its decision. *United States v. Johnson,* 457 U.S. 537, 548, 102 S.Ct. 2579, 2586–87, 73 L.Ed.2d 202 (1982). An exception to this rule may be made only after the court weighs three factors. First, the decision must establish a new principle of law. Second, the court must determine whether retrospective application would retard the policy behind the rule. Third, the court must consider whether retrospective application would be inequitable. *Chevron Oil Co. v. Huson,* 404 U.S. 97, 106–07, 92 S.Ct. 349, 355–56, 30 L.Ed.2d 296 (1971).

Two other circuits have applied *Gulf Oil* retrospectively without discussion. *See Williams v. United States District Court,* 658 F.2d 430, 436 (6th Cir.) *cert. denied,* 454 U.S. 1128, 102 S.Ct. 980, 71 L.Ed.2d 116 (1981); *Zinser v. Continental Grain Co.,* 660 F.2d 754, 762 (10th Cir.), *cert. denied,* 455 U.S. 941, 102 S.Ct. 1434, 71 L.Ed.2d 652 (1981).

no specific findings made before the restrictions were imposed that would justify them. "[T]he mere possibility of abuses does not justify routine adoption of a communications ban that interferes with the formation of a class or the prosecution of a class action in accordance with the Rules." *Gulf Oil,* 452 U.S. at 104, 101 S.Ct. at 2202. In

We agree that the rule established in *Gulf Oil* should not be restricted to prospective application. A decision will be denied retrospective application only if it makes a "clear break" with past precedent. *United States v. Johnson,* 457 U.S. 537, 551 n. 12, 102 S.Ct. 2579, 2587 n. 12, 73 L.Ed.2d 202 (1982). Although *Gulf Oil* was a "new decision" in the sense that it decided an issue the Supreme Court had not previously addressed, the decision was not without precedent. In *Rodgers v. United States Steel Corp.,* 508 F.2d 152 (3d Cir.1975), the Third Circuit invalidated a local rule prohibiting all communications with class members before certification unless approved by the court. The *Gulf Oil* opinion itself quotes from *Coles v. Marsh,* 560 F.2d 186, 189 (3d Cir.) *cert. denied,* 484 U.S. 985, 98 S.Ct. 611, 54 L.Ed.2d 479 (1977), which held that a district court could not restrict communications in a class action absent a showing of the particular threatened abuses. 452 U.S. at 102, 101 S.Ct. at 2201. Analogous authority cited in *Gulf Oil* also imposed a duty in the context of issuance of protective orders. *See In Re Halkin,* 598 F.2d 176, 198 (D.C.Cir.1979) (Protective Order under Rule 26(c) "restrains plaintiff's expression yet the district court made no assessment of the strength of the continuing interest, the need for such a broad restriction, or the availability of alternate measures. In the absence of these findings, the petitioner's right to be free of the restriction is clear and undisputable"), *cited at* 452 U.S. at 102 n. 16, 101 S.Ct. at 2201 n. 16. The district court itself, in this case, acknowledged that the propriety and constitutionality of Local Rule 23(g) were in doubt.

**8.** The following comes from Judge Solomon's unpublished opinion in the damages phase of trial:

In addition to the claim forms prepared by the claimants or by persons on behalf of the claimants, plaintiffs' counsel prepared written statements to supplement the claim forms, based upon their interviews with the claimants. . . .

. . . .

Many of the narrative statements prepared by plaintiffs' counsel went far beyond the contentions in the claim forms. The courtroom testimony and depositions revealed that these statements were inaccurate or exaggerated. Some of them contradicted statements in the claim forms, sometimes with the explanation that the claimant had not understood these simple forms.

its unpublished decision on damages, the district court suggested that plaintiffs' counsel may have overstepped ethical bounds in the zealousness of their handling of individual claims.[8] This after-the-fact pronouncement cannot substitute for a reasoned inquiry and findings supporting the restrictions prior to their imposition.[9]

A more accurate explanation of these discrepancies is that certain named plaintiffs and others importuned many of these claimants to file claims or to testify contrary to the facts. For example, one claimant testified at a court hearing that he was not qualified for the jobs he checked on the claim form, but had done so because of the urging of others. Another who apparently was making an equal pay claim testified that he was treated fairly. Many claimants knew nothing about the duties or qualifications of jobs which they had checked on the claim form.

The questions asked claimants on their depositions, in the presence of defendant's counsel, were leading and suggestive. The claimants were asked to consider so-called facts and information, of which they had no knowledge when they worked for Nefco, as the basis for answering whether they sought particular jobs or whether they were deterred from asking for such jobs and whether they were qualified to hold those jobs.

Their answers, often uncertain and equivocal, became positive assertions of interest, availability, and competence in the written narrative statements prepared for them by plaintiffs' counsel. These distortions may have been compounded in those interviews in which the claimants and plaintiffs' counsel refused to permit the questions and answers to be recorded.

*Damages Op., supra* note 5, at 5–6.

**9.** The first amendment interests involved here also would have required the district judge to make findings as to the necessity for the restrictions. Before a prior restraint on speech may be imposed, "the substantive evil must be extremely serious and the degree of imminence extremely high." *Landmark Communications, Inc. v. Virginia,* 435 U.S. 829, 845, 98 S.Ct. 1535, 1544, 56 L.Ed.2d 1 (1978). The Supreme Court has held that a "solidity of evidence" is necessary to make the requisite showing of imminence. *Id.* Moreover, "[t]he danger must not be remote or even probable; it must immediately imperil." *Craig v. Harney,* 331 U.S. 367, 376, 67 S.Ct. 1249, 1255, 91 L.Ed. 1546 (1947). These standards apply to restrictions entered pursuant to Rule 23. *See Gulf Oil Co. v. Bernard,* 619 F.2d 459, 475–76 (5th Cir.1980) (en banc), *aff'd on other grounds,* 452 U.S. 89, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1981) ("Rule 23,

Nefco contends *Gulf Oil* is inapplicable to this case because it involved a restriction on communications imposed before the certification of the class, while those at issue here were imposed after class certification. We reject this argument. If anything, the policies weighing in favor of communications restrictions after the class has been certified are much less compelling than before certification.

At the time the district court imposed restrictions in this case, the usual concerns weighing in favor of restrictions were not present. The *Manual for Complex Litigation,* and Local Rule 23(g), specifically identify the principal concerns: (1) solicitation of direct representation of class members who are not formal parties, (2) solicitation of funds and agreements to pay fees, (3) solicitation by defendants of requests to opt out, and (4) communications which may be confusing or misleading, or create an impression which reflects adversely on the court. *Manual for Complex Litigation* § 1.41 (1973). *See also Gulf Oil,* 452 U.S. at 100 & n. 12, 101 S.Ct. at 2200 & n. 12. The abuses at which communications restrictions are aimed arise from the fact that the class representative and his counsel may have interests that are in conflict with those of the class members. Thus, for example, counsel might want class members to participate in the litigation as named plaintiffs, when some class members might profit more from remaining inactive or opting out. It is hard to identify any conflict of interest that might have existed between plaintiffs' counsel and class members during the time at issue here. Nefco's liability had already been determined. Because the class had already been certified, class members who did not present their claims would be barred by *res judicata* from ever obtaining relief. Class members' only interest was in presenting their claims to the court in the best possible light. Plaintiffs' counsel, whatever their motives, had the same interest.

We must reverse if plaintiffs show that the restrictions on communications "created at least potential difficulties for them as they sought to vindicate the legal rights of a class of employees." *Gulf Oil,* 452 U.S. at 101, 101 S.Ct. at 2200. Plaintiffs contend that the restrictions interfered with their ability effectively to prosecute the individual claims for damages in the following ways: (1) the requirement that a Nefco attorney be present at the interviews discouraged confidentiality and hence hampered preparation of claim forms; (2) class members who were not willing to risk reprisals before even submitting a claim were discouraged from consulting with class counsel since a Nefco attorney would also be present; (3) the fact that English was a second language for many claimants gave rise to a special need for aid of counsel in preparing claims.

 It is obvious that few, if any, of the claimants in this case could afford private counsel. The availability of a federal magistrate to help claimants is no substitute for an advocate who will help claimants to present their claims in the best possible light. The trial court seems unnecessarily concerned that counsel would be overzealous in the pursuit of claims. The advocacy system is designed to correct for excesses through response from opposing counsel, rather than through court-imposed restrictions which interfere with legal assistance to class members. The restrictions are particularly inappropriate where class members have no other effective means to secure counsel. Therefore, we reverse the trial court's findings on the individual claims and remand for a rehearing on the damage awards. The district court must allow all class members a reasonable time in which to submit claims prepared with the aid of counsel *ab initio* rather than supplementary to their original claims. The original claims should be disregarded unless no new claim is presented.

---

as a specific aspect of the administration of justice, [does not] create an exception to the principles governing prior restraints.... The validity of a prior restraint entered under Rule

23 must be tested by the same standards utilized in other contexts."); *accord Rodgers v. United States Steel Corp.,* 536 F.2d 1001, 1008 (3d Cir.1976).

## V. *Definition of the Class*

In this case, the district court certified the plaintiff class as all nonwhites who either were employed by Nefco, applied for employment with Nefco, or were deterred from applying for employment with Nefco at any time between 300 days prior to November 26, 1971 (the date Domingo filed his charge with the EEOC) and the date of the damages phase of the trial. This definition covers the canning seasons 1971 through 1976, inclusive. Domingo challenges both the upper and lower limits of the time scope of the class. He contends that the continuing violation theory announced in cases such as *Reed v. Lockheed Aircraft Corp.*, 613 F.2d 757, 759–61 (9th Cir.1980), permits victims of discrimination at an earlier time to recover. He also contends that the district court erred in failing to grant relief for discrimination after the 1976 season, citing *United States v. Lee Way Motor Freight, Inc.*, 625 F.2d 918 (10th Cir.1979). We hold that the trial court was correct in establishing the starting date of the class action 300 days prior to the date Domingo filed his EEOC charge, but that it erred in refusing relief for discrimination after the date of trial.

 As the district court correctly pointed out, a charge of employment discrimination under Title VII must be filed with the EEOC within 180 days of an alleged unlawful employment practice, or within 300 days of such a practice if the charging party has initially instituted proceedings with a state or local antidiscrimination agency. Title VII, § 706(e), 42 U.S.C. § 2000e–5(e) (1976).[10] It is now well settled that a named plaintiff who has filed a timely charge may bring a class action on behalf of class members who have not filed

charges. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 414 n. 8, 95 S.Ct. 2362, 2370 n. 8, 45 L.Ed.2d 280 (1975); *Oatis v. Crown Zellerbach Corp.*, 398 F.2d 496, 499 (5th Cir.1968). In addition, the filing of a class action suspends the applicable statute of limitation for all class members. *Crown, Cork, & Seal Co. v. Parker*, —— U.S. ——, 103 S.Ct. 2392, 2397, 76 L.Ed.2d 628 (1983); *American Pipe & Construction Co. v. Utah*, 414 U.S. 538, 554, 94 S.Ct. 756, 766, 38 L.Ed.2d 713 (1974). It follows, then, that Domingo may represent all class members whose claims were not already time-barred at the time he filed his charge, irrespective of whether the class members had filed charges of their own. *Payne v. Travenol Laboratories, Inc.*, 673 F.2d 798, 813–14 (5th Cir.), *cert. denied*, 459 U.S. 1038, 103 S.Ct. 451, 74 L.Ed.2d 605 (1982); *Laffey v. Northwest Airlines, Inc.*, 567 F.2d 429, 472 (D.C.Cir.1976), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1281, 55 L.Ed.2d 792 (1978); *Wetzel v. Liberty Mutual Insurance Co.*, 508 F.2d 239, 246 (3d Cir.), *cert. denied*, 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975).

In this case, the district court allowed all class members to receive the benefit of the 300-day limitation period rather than the general 180-day period. Although Title VII seems to say that the longer period is to be used only for claimants who have instituted proceedings with an appropriate state agency, we have held the 300-day period applicable to the class. *Williams v. Owens-Illinois, Inc.*, 665 F.2d 918, 923 n. 2 (9th Cir.), *cert. denied*, 459 U.S. 971, 103 S.Ct. 302, 74 L.Ed.2d 283 (1982); *see Bartelt v. Berlitz School of Languages of America, Inc.*, 698 F.2d 1003, 1004 (9th Cir.), *cert. denied*, —— U.S. ——, 104 S.Ct. 277, 78 L.Ed.2d 257 (1983). The district court's class definition

---

**10.** At the time Domingo filed his charge, the relevant limitation periods under the Civil Rights Act of 1964 were 210 days if proceedings had been instituted with an appropriate state agency, and 90 days otherwise. Civil Rights Act of 1964, Pub.L. No. 88–352, § 706(d), 78 Stat. 241, 260. However, while Domingo's charge was pending before the EEOC Congress enacted the Equal Employment Opportunity Act of 1972, which lengthened the limitation periods. Equal Employment Opportunity Act of 1972, Pub.L. No. 92–261, § 4(a),

86 Stat. 103, 104. The 1972 act stated that its provisions applied to all charges pending before the EEOC on the date of enactment or filed thereafter. *Id.* § 14, 86 Stat. at 113. We believe that the ends of efficiency and economy in class litigation, as well as the intent of Congress, are best effectuated by allowing the benefit of the lengthened limitation periods to inure to all members of the class. *See American Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 553–54, 94 S.Ct. 756, 766, 38 L.Ed.2d 713 (1974).

was therefore correct, although the definition would have to be modified if the action were brought today. *Williams,* 665 F.2d at 923–24 n. 2.

Domingo argues, nevertheless, that the continuing violation doctrine announced in this circuit operates to eliminate the limitation period. The continuing violation theory recognizes the principle that a plaintiff may be able to recover under Title VII if he or she can demonstrate a pattern or practice of discrimination that has continued into the present, notwithstanding his or her ability to prove specific instances of discrimination personally suffered at the hands of the defendant within the limitation period of Title VII. *See O'Brien v. Sky Chefs, Inc.,* 670 F.2d 864, 868 (9th Cir.1982); *Reed v. Lockheed Aircraft Corp.,* 613 F.2d 757, 761–62 (9th Cir.1980). Thus, Domingo reasons, if a continuing violation has been demonstrated a class member should be able to recover regardless of when the class member was employed. That statement is not quite true.

▪ We note, first, that the defendant's conduct, as found by the district court, did indeed constitute a continuing violation of Title VII. In order for a violation to be continuing, it must involve a practice, continued over a period of time, which operates to injure the plaintiff either individually or as a member of a class to which the plaintiff belongs. *See Williams v. Owens-Illinois, Inc.,* 665 F.2d 918, 924–25 & n. 3 (9th Cir.), *cert. denied,* 459 U.S. 971, 103 S.Ct. 302, 74 L.Ed.2d 283 (1982); *Reed v. Lockheed Aircraft Corp.,* 613 F.2d 757, 760 (9th Cir.1980); *Elliott v. Sperry Rand Corp.,* 79 F.R.D. 580, 585–86 (D.Minn.1978). Here, plaintiffs have attacked Nefco's hiring and promotion systems and policies. There is no question that these policies remained intact from season to season. Moreover, the practices were not confined in application to any particular individual or group of individuals, but operated against the class generally. Indeed, the district court implicitly

found, as a matter of fact, that Nefco's practices were classwide in application when it certified the class under Fed.R. Civ.P. 23(b)(2).[11]

▪ Domingo's argument, however, would effectively read the limitation period out of the statute, which we cannot do. As the Supreme Court has stated:

> A discriminatory act which is not made the basis for a timely charge is the legal equivalent of a discriminatory act which occurred before the statute was passed. It may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue, but separately considered, it is merely an unfortunate event in history which has no present legal consequences.

*United Air Lines, Inc. v. Evans,* 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977). The continuing violation theory is a way of introducing this type of background evidence. In *Reed v. Lockheed Aircraft Corp.,* 613 F.2d 757 (9th Cir.1980), the plaintiff launched a sweeping attack on Lockheed's systems of promotion, compensation, and training. She alleged three specific instances of discrimination, in 1963, 1969, and 1972, but filed her charge in 1976. The district court held her claim time-barred and we reversed, saying that the specific events of which plaintiff complained "are but evidence that a *policy* of discrimination pervaded Lockheed's personnel decisions. The violations of which she complains occurred each day of her employment, *including the days within the appropriate limitations period.*" *Id.* at 760 (latter emphasis added); *accord Scott v. Pacific Maritime Association,* 695 F.2d 1199, 1206 (9th Cir. 1983). It follows that, as a prerequisite to obtaining relief, each class member must demonstrate, by fact of employment or otherwise, that he or she had been discriminated against during the limitation period or was a member of a group exposed to discrimination during that time.

---

11. We note that the drafters of Rule 23 specifically contemplated that suits against discriminatory hiring and promotion policies would be appropriately maintained under Rule 23(b)(2). *Wetzel v. Liberty Mutual Ins. Co.,* 508 F.2d 239, 250 (3d Cir.), *cert. denied,* 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975). Such suits, then, may be particularly appropriate for continuing violation treatment.

Domingo argues that the district court should have granted relief for discrimination after the 1976 season. We agree. In *United States v. Lee Way Motor Freight, Inc.*, 625 F.2d 918, 945 (10th Cir.1979), the Tenth Circuit held it was error not to consider claims of discrimination which occurred after the complaint was filed, where there was no break in the pattern of discrimination. Here, the special master found that Nefco's employment practices had continued, unchanged, past the 1976 season. As in the *Lee Way* case, it would be inequitable to refuse to consider these claims, many of which might otherwise be time-barred.

 Permitting post-1976 claims to be heard would also be consistent with two of the most important policies underlying Rule 23. One is the "vindication of the rights of individuals who otherwise might not consider it worth the candle to embark on litigation in which the optimum result might be more than consumed by the cost." *Deposit Guaranty National Bank v. Roper*, 445 U.S. 326, 338, 100 S.Ct. 1166, 1174, 63 L.Ed.2d 427 (1980). The other is the central purpose of Rule 23, that is, to have litigation in which common interests or common questions of law or fact prevail disposed of, where feasible, in a single lawsuit. *See Rodgers v. United States Steel Corp.*, 508 F.2d 152, 156, 163 (3d Cir.), *cert. denied*, 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975).

## VI. *Damages*

### A. *Employment Discrimination*

Our decision on the communications issue requires reversal of the district court's denial of individual back-pay claims. Because the district court will have to redetermine these claims on remand, we address plaintiffs' contention that the district court should have awarded class-wide relief rather than attempting to determine the precise amount of back-pay owing to each individual claimant.

 The facts of this case justify a departure from an individualized remedy for each claimant although we recognize that as a general rule that approach should be used. *See Hameed v. International Association of Bridge Workers*, 637 F.2d 506, 519 (8th Cir.1980); *Stewart v. General Motors Corp.*, 542 F.2d 445, 452 (7th Cir.1976), *cert. denied*, 433 U.S. 919, 97 S.Ct. 2995, 53 L.Ed.2d 1105 (1977). Nefco's lack of objective hiring criteria and use of word-of-mouth recruitment directed at particular ethnic groups makes it difficult to determine precisely which of the claimants would have been given a better job absent discrimination, but it is clear that many should have. In such a situation, class-wide relief is appropriate.[12] "[W]hen the class size or the ambiguity of promotion or hiring practices or the illegal practices continued over an extended period of time calls forth [a] quagmire of hypothetical judgment ... a class-wide approach to the measure of back-pay is necessitated." *Pettway v. American Cast Iron Pipe Co.*, 494 F.2d 211, 261 (5th Cir.1974).

 Determination of the award could proceed along any of several avenues, all of which are designed to estimate the difference between what non-whites actually earned and what they would have earned but for the discrimination. *See, e.g., Hameed*, 637 F.2d at 520–21; *Stewart*, 542 F.2d at 453–54; *Pettway*, 494 F.2d at 250. The court could determine a lump sum to be distributed among claimants in proportion to the number of seasons they worked or should have worked, or it could make individual awards based on the difference between what claimants actually earned and what they would have earned, on the average, had non-whites occupied their fair share of the better paying jobs. The district court should keep in mind that discrimination has already been proved; "proof of a discriminatory pattern and prac-

---

12. Because non-whites were not underrepresented in Nefco's lower-paying cannery positions, class-wide relief is not appropriate for those class members denied those jobs. However, many claimants have alleged they were discharged from those positions, or refused a job, in retaliation for complaining about discrimination or for other discriminatory reasons. Such claimants may prove entitlement, on an individual basis, for back-pay relating to any of Nefco's job categories.

tice creates a rebuttable presumption in favor of relief." *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 359 n. 45, 97 S.Ct. 1843, 1867 n. 45, 52 L.Ed.2d 396 (1977).

In order to be eligible for back-pay, claimants need only prove they applied for a position or would have applied if not for Nefco's discriminatory practices. They may be required to show what their qualifications were, but do not have the burden of proving they were qualified for the position sought. Because class-wide discrimination has already been shown, the employer has the burden of proving that the applicant was unqualified or showing some other valid reason why the claimant was not, or would not have been, acceptable. *See International Brotherhood of Teamsters,* 431 U.S. at 362, 97 S.Ct. at 1868; *Pettway v. American Cast Iron Pipe Co.,* 681 F.2d 1259, 1266 (11th Cir.1982), *petition for cert. filed,* 51 U.S.L.W. 3512 (U.S. Dec. 23, 1982) (No. 82–1074).

In determining whether claimants applied or were deterred from applying for a better position, the district court should not put an unrealistic burden on claimants. Given the extreme segregation in both living and working environments and Nefco's use of racial labels, it can be assumed that all Nefco employees were aware of its discriminatory hiring practices. Nefco's discriminatory hiring procedures, themselves, created the difficulty many claimants have experienced in attempting to prove application or deterrence. Application procedures were informal. Word-of-mouth recruitment, directed along racial lines, made it especially difficult for present or prospective employees to become aware of openings as they occurred. Such recruitment procedures also may have created confusion about what Nefco was looking for by way of qualifications since non-whites were sought only for certain positions. Because Nefco lacked formal application procedures, any request for a better position made to a superior should suffice as an application. Denial of past applications, even in years prior to those at issue here, is more than enough proof of deterrence in later years. All uncertainties should be resolved against the employer. *See Stewart,* 542 F.2d at 452; *Pettway,* 494 F.2d at 261.

**B.** *Housing Discrimination*

Nefco argues that any award of damages for housing discrimination was inappropriate, while Domingo argues that the district court's damages award for housing discrimination was inadequate. Both contentions are without merit.

Nefco asserts that Title VII provides for only equitable relief and backpay and does not allow compensatory or punitive damages, *Padway v. Palches,* 665 F.2d 965, 968 (9th Cir.1982), and argues that the district court's award for housing discrimination cannot be characterized as backpay. If the class members had actually paid rent to Nefco for housing with a fair market rental value below the amount of rent paid, they could be awarded backpay in the amount of the difference between rent paid and the fair market rental value of the housing they received. *Cf. Williams v. Yazoo Valley-Minter City Oil Mill, Inc.,* 469 F.Supp. 37, 54 (N.D.Miss.1978). However, since Nefco did not charge any rent to its employees, the company argues that any damage they suffered is not an identifiable economic loss, but is more closely analogous to the inferior working conditions for which the Sixth Circuit disallowed compensatory damages in *Harrington v. Vandalia-Butler Board of Education,* 585 F.2d 192, 194–97 (6th Cir.1978), *cert. denied,* 441 U.S. 932, 99 S.Ct. 2053, 60 L.Ed.2d 660 (1979).

In *Harrington,* a female physical education instructor sought damages based on the difference between her office facilities and those of her male counterparts. Male physical education instructors were given offices and private locker, toilet, and shower facilities. The female instructor had only a partitioned area for an office and was forced to share locker, toilet, and shower facilities with her students. The court found that a damage award on this basis would be an award of compensatory damages which would be inappropriate under Title VII.

■ We think, as the district court did, that Nefco supplied room and board as part of the compensation paid to its employees. The lodging provided by Nefco was for the personal use of its employees and was not part of the actual on-the-job work environment as were the office facilities in *Harrington.* On such facts, an award of backpay is proper under the Equal Pay Act, *Laffey v. Northwest Airlines, Inc.,* 567 F.2d 429, 455 n. 175 (D.C.Cir.1976), *cert. denied,* 434 U.S. 1086, 98 S.Ct. 1281, 55 L.Ed.2d 792 (1978); 29 U.S.C. § 203(m) (1976), and there is no reason why a like award should be denied under Title VII. Thus, on these facts a measurable difference in the quality of housing provided to whites as opposed to nonwhites can be characterized as a wage differential for which relief is available under Title VII.

■ With respect to the amount of the district court's backpay award for the disparity in rental value between the white and nonwhite housing, Domingo argues that the $55,000 award was inadequate for several reasons.

Domingo claims that the district court erred in denying backpay for subjective disparities in housing, such as "squalor, stenches, peeling paint, unsanitary conditions, and defective plumbing." Domingo implies that the court failed to consider these subjective factors because their value was difficult to determine. Yet, the court spoke of the difficulty of determining the value of these factors as a rationale for not requiring individual proof of damages; it did not state that it was ignoring these factors in computing classwide damages. *Damages Op., supra* note 5, at 39. In fact, after discussing all the subjective factors that affected housing value, the district court stated that it was making its award "[t]aking all these adjustments into account, and recognizing the impossibility of precise calculations." *Id.* at 40.

■ Domingo also asserts that the district court erred in not awarding prejudgment interest on the amount of damages determined. Cases from other circuits have held that an award of prejudgment interest on a backpay award is appropriate.

*See, e.g., United States v. Lee Way Motor Freight, Inc.,* 625 F.2d 918, 940 (10th Cir. 1979); *Pettway v. American Cast Iron Pipe Co.,* 494 F.2d 211, 263 (5th Cir.1974). Such an award, however, is discretionary with the trial court. *Taylor v. Phillips Industries, Inc.,* 593 F.2d 783, 787 (7th Cir.1979); *see Twin City Sportservice, Inc. v. Charles O. Finley & Co.,* 676 F.2d 1291, 1310 (9th Cir.), *cert. denied,* 459 U.S. 1009, 103 S.Ct. 364, 74 L.Ed.2d 400 (1982). The fact that the amount of backpay is not readily determinable weighs against awarding prejudgment interest. *See, e.g., Perkins v. Standard Oil Co.,* 487 F.2d 672, 675 (9th Cir. 1973); *Elte, Inc. v. S.S. Mullen, Inc.,* 469 F.2d 1127, 1133 (9th Cir.1972). In view of the many subjective factors the court valued in determining the amount of damages, we find no abuse of discretion.

## VII. *Attorneys' Fees*

Domingo contends that the district court's award of attorneys' fees was inadequate. Because a significant factor in fee awards is the extent of success achieved in the litigation, *Hensley v. Eckerhart,* —— U.S. ——, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), our remand for determination of further relief to the class members requires that the fee award also be reconsidered by the district court. Furthermore, a major consideration in the district court's fee determination was its opinion that plaintiffs' counsel made many unnecessary and frivolous motions, including challenges to the court's restrictions on communications to class members. Because we hold that the challenges to the restrictions were necessary to correct the district court's error, the fee award must be reconsidered in light of our ruling. Since the fee award must be fully reconsidered, we make certain observations that may be pertinent to that reconsideration. The district court's reasons are not adequate to justify the unusually low award of $70,000 to cover fees and costs for 6800 hours of service over several years.

■ In discussing the customary fee charged, the court noted that cases like this were often handled by publicly-supported

organizations, implying that this fact justified a reduction in the fee. To the contrary, representation by a public interest group should be compensated at the same rates charged by comparable private counsel. *Dennis v. Chang,* 611 F.2d 1302, 1309 (9th Cir.1980). The district court recognized that such cases were handled on a contingency basis, a factor which justifies a greater, not a lesser, award.

■ The district court was also incorrect in its conclusions that a low fee was justified because the lawsuit should never have been brought. The court suggested the suit served no useful purpose because the company had already entered into an agreement with the EEOC to make a "good faith effort" to increase the number of minorities in white-dominated positions. That agreement, however, would do nothing to compensate the victims of past discrimination. Moreover, the evidence in this case indicates that Nefco's discriminatory practices continued after the agreement.

The district court's opinion, although discussing why the court felt plaintiffs' counsel were not entitled to the full amount of fees they requested, gives no indication as to how it arrived at the amounts it awarded. Although a district judge need not show precise calculation if the record contains sufficient facts to give a reviewing court a basis for upholding the award if the award differs significantly from the proof offered by counsel, as this one did, some explanation as to how the district court arrived at its figures is necessary. See *Harmon v. San Diego County,* 664 F.2d 770, 772 (9th Cir.1981).

## VIII. *Conclusion*

The district court's judgment on liability, 445 F.Supp. 421, is AFFIRMED.

The district court's judgment as to damages is VACATED. The cause is REMANDED for determination of damages on plaintiffs' section 1981 claim, and for redetermination of attorneys' fees and damages for employment discrimination, after plaintiffs' counsel have had the opportunity to assist class members in presenting their claims.

The parties shall bear their respective costs in this appeal.

CHOY, Circuit Judge, dissenting in part:

The majority holds that the restrictions imposed by the district court upon communications between potential class members and the plaintiffs and their counsel is reversible error under *Gulf Oil Co. v. Bernard,* 452 U.S. 89, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1981). Because I believe that the restrictions Judge Solomon imposed were justified by the conduct of plaintiffs' counsel, I find the *Gulf Oil* violation to be only a technical one. I would not reverse on that basis.

In *Gulf Oil,* the Supreme Court held that a district court had abused its discretion by imposing communication restrictions on the named plaintiff and his counsel in a class action. The Court apparently adopted a two-prong test to determine the validity of communication restrictions: (1) The court imposing the restrictions must examine the proposed order to see if there are any less onerous means to protect against abuse by plaintiff or plaintiff's counsel, and (2) there should be "a clear record of specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties." *Id.* at 101–02, 101 S.Ct. at 2200–01. *But see Williams v. United States District Court,* 658 F.2d 430, 435 (6th Cir.) (adopting a three-prong test), *cert. denied,* 454 U.S. 1128, 102 S.Ct. 980, 71 L.Ed.2d 116 (1981).

In *Gulf Oil,* the Court emphasized its frustration with the state of the record when it noted that "[t]he record reveals no grounds on which the District Court could have determined that it was necessary or appropriate to impose this order," and that "one looks in vain for any indication of a careful weighing of competing factors." 452 U.S. at 102, 103, 101 S.Ct. at 2200, 2201 (footnote omitted). Here, while there is no clear record of specific findings of the type contemplated by *Gulf Oil,* nevertheless I find no reversible error because (1) adequate justification is in the record for Judge Solomon's actions, and (2) it is obvious that he made the type of weighing

contemplated by *Gulf Oil.* I would not find reversible error merely because he did not document his mental processes.

### A. *Conformity with Rule 23 Policies*

The Supreme Court in *Gulf Oil* held that Rule 23 interests were implicated when an order interfered with efforts to inform potential class members of the existence of a lawsuit, or when it hampered the plaintiff's efforts to obtain information about the merits of the case from the persons sought to be represented. 452 U.S. at 101, 101 S.Ct. at 2200. The Court, however, did acknowledge that some restrictions on communication may be justified by potential abuses associated with communications to class members, such as the "heightened susceptibility of nonparty class members to solicitation amounting to barratry as well as the increased opportunities of the parties or counsel to 'drum up' participation in the proceeding," or by potential for confusion and adverse effects on the administration of justice from "communications to class members that misrepresent the status or effect of the pending action." *Id.* at 100 & n. 12, 101 S.Ct. at 2200 & n. 12 (quoting *Waldo v. Lakeshore Estates, Inc.,* 433 F.Supp. 782, 790 (E.D.La.1977), *appeal dismissed mem.,* 579 F.2d 642 (5th Cir.1978)).

If any Rule 23 interests were implicated here, there is clear justification in the record. As early as November 28, 1977, Judge Solomon was aware of a predilection on the part of plaintiffs' counsel to misrepresent the status or effect of the action with an apparent intent to generate participation in the litigation. On that date, the following exchange took place between Mr. Arditi, Domingo's counsel, and Judge Solomon:

> MR. ARDITI: Well, we submitted a proposed form of notice—
>
> THE COURT: Well, I'm not going to give that thing, Mr. Arditi. And you shouldn't ask for such a biased statement. If there is extraneous work based upon this type of presentation, I'm going to assess you with costs. I think there should be a little better way of inquiring of those people.
>
> . . . .

> MR. ARDITI: . . . The Defendant wants the claim form to be the first step in a series of contacts with the class members. . . .
>
> THE COURT: Well, how would you do it? You would tell them they're all entitled to money right now, and they may not be.
>
> MR. ARDITI: I understand that.
>
> THE COURT: Yes.
>
> . . . .
>
> THE COURT: I'll tell you that I think that the Defendant's [claim] form is a lot better than your's [sic]. But I think it is biased in certain respects, and I'm not going to send out a form which I think either favors or disfavors either the Plaintiffs or the Defendants. . . .

Transcript of Motion, at 12, 15, 17 (Nov. 28, 1977).

His concerns, which were apparently borne out by subsequent events, as this court notes, *supra* p. 15b n. 8, constitute a valid basis for imposing communication restrictions consistently with Rule 23. *See Gulf Oil,* 452 U.S. at 100 & n. 12, 101 S.Ct. at 2200 & n. 12.

This case is not one in which the district judge imposed the communication restrictions as a matter of routine compliance with a local rule (here, Local Rule 23(g)). As this court observes, *supra* p. 15b n. 6, the district court itself acknowledged that the propriety and constitutionality of Local Rule 23(g) was in doubt. I therefore have no difficulty finding that Judge Solomon in fact engaged in the weighing process contemplated by *Gulf Oil* despite the lack of a specific enumeration of his reasons for imposing the restrictions.

I seriously question whether the policies underlying Rule 23 were frustrated, if at all, to an extent sufficient to justify invalidating many years of complex damages litigation. First, plaintiffs, in their capacity as class representatives, did not need information about the merits of the case at that stage of the proceedings. Second, the order only minimally interfered with plaintiffs' counsel's efforts to inform potential class members of the suit, and the interference

was not injurious to plaintiffs and the class as a whole.

Plaintiffs had little need, as class representatives, to obtain information about the merits of the case at that stage. At the time of the events complained of, the liability portion of the case already had been concluded in plaintiffs' favor. Only the damages portion remained, and the district court was for the most part determining damages on an individual rather than a classwide basis.

The interference with plaintiffs' counsel's efforts to inform class members of the action was not injurious to either plaintiffs or the class. In *Gulf Oil,* time was of the essence because the class members were being pressed by Gulf to sign a release of their claims in return for offered backpay. No similar circumstances existed here, so any delay occasioned by the order did not injure plaintiffs.

In addition, plaintiffs do not dispute the adequacy of notice actually sent to class members, but do complain that they were not allowed to assist class members in completing claim forms. It is true that a common problem with orders restricting communication is that they hamper "the quest for a fair resolution of absentees' claims by prohibiting communications with class members that enable them to make informed decisions about their participation in the pending litigation." *Williams v. United States District Court,* 658 F.2d 430, 436 (6th Cir.), *cert. denied,* 454 U.S. 1128, 102 S.Ct. 980, 71 L.Ed.2d 116 (1981). Here, the notice sent to class members offered potential claimants the assistance of four United States magistrates, one each in Anchorage, Alaska; Sacramento, California; Portland, Oregon; and Seattle, Washington. Moreover, claimants in this case were given three months to return their forms, which would seem to have been enough time to seek a magistrate's assistance.

On this record, then, I would hold that the district court structured the proceedings so that the communication restrictions imposed were consistent with Rule 23 policies. The court had a duty to prevent abuse; I cannot say that it overstepped its discretion in choosing the means to do so. *See* 452 U.S. at 100, 104, 101 S.Ct. at 2200, 2202.

B. *Retroactivity of the* Gulf Oil *Rule*

As discussed above, I would hold that the district judge conducted the proceedings below in a manner consistent with Rule 23 policies. In fact, I find that Judge Solomon implicitly took all of the steps prescribed by *Gulf Oil,* except for leaving explicit written findings that would have made his mental processes unmistakably clear. That may be a violation of *Gulf Oil.* When Judge Solomon conducted his proceedings, however, *Gulf Oil* had not yet been decided. I would hold, then, that the *Gulf Oil* rule of specific findings is a prophylactic rule inappropriate for retroactive application.

Three factors are generally considered in determining retroactivity of a decision: first, whether the decision establishes a new principle of law, either by overruling precedent or resolving an issue in a manner which was not clearly foreshadowed; second, whether retrospective application of the decision would retard the policy behind the decision; and third, whether substantial inequity is produced by retroactive application. *Chevron Oil Co. v. Huson,* 404 U.S. 97, 106–07, 92 S.Ct. 349, 355, 30 L.Ed.2d 296 (1971); *Wiltshire v. Standard Oil Co.,* 652 F.2d 837, 841 (9th Cir.1981) (Title VII case).

Here, it is clear that the *Gulf Oil* decision announced a new rule of law. *Gulf Oil* invalidated a form of pretrial order that was drawn verbatim from the *Manual for Complex Litigation,* a book prepared under the auspices of the Federal Judicial Center and relied upon by trial courts across the nation. As to inequity produced by retroactivity, the *Gulf Oil* decision has the potential to vitiate many years' worth of complex class litigation in this and many other cases. As to effect on policy behind the decision, I see no justification for wholesale reversal of proceedings for failure to comply with what is essentially a prophylactic rule. This court has noted that "it is appropriate to limit to prospective application decisions which announce prophylactic protections

without conferring new constitutional rights." *Yellowwolf v. Morris,* 536 F.2d 813, 816 (9th Cir.1976). Prophylactic rules frequently have been given prospective application only. *See, e.g., Berry v. City of Cincinnati,* 414 U.S. 29, 94 S.Ct. 193, 38 L.Ed.2d 187 (per curiam) (rule of automatic habeas if indigent defendant not represented by appointed counsel at trial); *Michigan v. Payne,* 412 U.S. 47, 55–57, 93 S.Ct. 1966, 1970–72, 36 L.Ed.2d 736 (1973) ("prophylactic" due process protection limitations established by *North Carolina v. Pearce,* 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969)); *Johnson v. New Jersey,* 384 U.S. 719, 729–32, 86 S.Ct. 1772, 1778–80, 16 L.Ed.2d 882 (1966) (*Miranda* and *Escobedo* rules). I therefore would apply *Gulf Oil* not to this case, but prospectively only.

## C. *Plaintiffs' Free Speech Rights*

Since I feel that the district court acted consistently with the letter and the policy of Rule 23, I would find no merit in plaintiffs' contention that the district court's actions impermissibly abridged their free speech rights. Rule 23, like the other Federal Rules of Civil Procedure, carries a strong presumption of constitutional validity. As the Supreme Court said, "[T]he court has been instructed to apply the Federal Rule, and can refuse to do so only if the Advisory Committee, this Court, and Congress erred in their prima facie judgment that the Rule in question transgresses neither the terms of the Enabling Act nor constitutional restrictions." *Hanna v. Plumer,* 380 U.S. 460, 471, 85 S.Ct. 1136, 1144, 14 L.Ed.2d 8 (1965).

Plaintiffs have not convinced me that such an error was made. The district court found an imminent danger of abuse of the class action device. Assuming that the communications to class members which the district court forbade constituted speech of a protected variety, such speech still can be restricted if "the substantive evil is extremely serious and the degree of imminence extremely high." *Landmark Communications, Inc. v. Virginia,* 435 U.S. 829, 845, 98 S.Ct. 1535, 1544, 56 L.Ed.2d 1 (1978) (quoting *Bridges v. California,* 314 U.S. 252, 263, 62 S.Ct. 190, 194, 86 L.Ed. 192 (1941));

Comment, *Judicial Screening of Class Action Communications,* 55 N.Y.U.L.Rev. 671, 686–87 (1980). The Supreme Court has recognized that attorney solicitation of clients may be limited when that solicitation "in fact is misleading, overbearing, or involves other features of deception or improper influence." *In re Primus,* 436 U.S. 412, 438, 98 S.Ct. 1893, 1908, 56 L.Ed.2d 417 (1978) (footnote omitted). Moreover, "the potential for overreaching is significantly greater when a lawyer, trained in the art of persuasion, personally solicits an unsophisticated, injured, or distressed lay person." *Ohralik v. Ohio State Bar Association,* 436 U.S. 447, 465, 98 S.Ct. 1912, 1923, 56 L.Ed.2d 444 (1978) (footnote omitted). As demonstrated earlier, the district court found a clear danger of overreaching in claim solicitation. I find no constitutional infirmity.