**Willie Lee PREE, Plaintiff,**

v.

**STONE AND WEBSTER ENGINEERING CORP., Ed Palmer, Roland Christensen, Plasterer & Cement Masons Local Union 241, Defendants.**

**No. CV–R–83–17–ECR.**

United States District Court,
D. Nevada.

March 20, 1985.

G.C. Backus, Reno, Nev., for plaintiff.

Stephen S. Kent, Reno, Nev., for Stone & Webster, Ed Palmer and Roland Christensen.

Patrick D. Dolan, Reno, Nev., for Christensen and Plasterer & Cement Masons.

## MEMORANDUM DECISION AND ORDER

EDWARD C. REED, Jr., District Judge.

Plaintiff, a black male, seeks relief under Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq) for claimed unlawful and discriminatory discharge by defendant Stone & Webster Engineering Corp. (Stone & Webster). He also claims defendant Plasterers and Cement Masons Union Local 241 (Union) and defendant Roland Christensen, business agent for the Union, discriminated against him by not appointing him as job steward. Plaintiff alleges such discrimination occurred because of his race.

Jurisdiction of this Court is based upon 42 U.S.C. § 2000e-5(f) and 28 U.S.C. § 1343(4). Plaintiff previously exhausted his administrative remedies.

A bench trial of this action was held on December 27, 1984. Testimony and evidence were received on behalf of plaintiff and defendants.

On October 1, 1980, plaintiff was dispatched by the Union to Valmy, Nevada, to go to work as a cement mason for Stone & Webster. That defendant was constructing a new power generating plant for Sierra Pacific Power Company. Plaintiff worked on the job continuously until he was laid off on August 14, 1981.

While plaintiff did not have formal school or apprenticeship training as a cement mason, he learned on the job (while working as a laborer) from skilled masons and became a competent mason. He obtained his "book" entitling him to work as a member of the Union in 1967. He worked more or less steadily as a mason out of the Union hiring hall after that time until his said termination by Stone & Webster.

One of the principal questions to be resolved by the Court is the level of skill which plaintiff achieved as a cement mason, and whether his skill was as good as, or superior to, that of other masons who were his junior in seniority as employees of Stone & Webster. They were retained in employment at the time plaintiff was laid off.

During the year 1981 there was a considerable turnover and reduction in all crafts at Valmy as the first phase of construction of the power plant neared completion. The custom of both the employers and the Union in this area is that, where lay offs are to take place, the employees with least seniority as employees of the company are the first to be laid off.

By the last week of July 1981, the cement mason crew at the Valmy job consisted of defendant Ed Palmer (foreman), James Brown (job steward), Matthew Pribitnowsky, and plaintiff. At that time Mr. Brown retired, and Mr. Pribitnowsky was laid off. Within a week or so, at Mr. Palmer's request on behalf of Stone & Webster, the Union dispatched Leonard F. Hughes and Leslie T. Noland to Valmy as

replacement masons. Mr. Palmer specifically requested both Mr. Hughes and Mr. Noland by name to be sent to the job. He was permitted to do so under the agreements between Stone & Webster and the Union. At that point in time, plaintiff was first in seniority on the crew after the foreman, Mr. Palmer. Yet on August 14, 1981, Plaintiff was terminated in a discharge identified as on account of a "Reduction in Force" (RIF).

The decision to terminate plaintiff was made by Mr. Palmer, acting in behalf of Stone and Webster, in the course and scope of his duties as foreman. He testified that the reason he chose plaintiff for termination ahead of Mr. Hughes and Mr. Noland was that plaintiff was less skilled than the other two new crew members in the then scheduled upcoming work of finishing cement slabs and floors. He admitted plaintiff was highly skilled in cement work in walls, grinding and patchwork, but claimed in his testimony that such work on the project had, at that time, largely been completed. He claimed that plaintiff did not do slab and floor work efficiently and that he was too slow.

Mr. David Rivers, an engineer for Stone & Webster, also offered some uncomplimentary testimony concerning plaintiff's skills as cement mason. However, the extent to which Mr. Rivers is relying on personal observation or just on what Mr. Palmer told him is unclear.

As mentioned above, Mr. Palmer asked for Mr. Hughes and Mr. Noland by name when he asked for cement masons to be sent to the job to replace Mr. Brown and Mr. Pribitnowsky. He claims to have had extensive knowledge of the excellence of their work. He asserts it was on the basis of this knowledge that he sent for these two men, and also on the same basis that he retained them at the time he discharged plaintiff. Mr. Hughes had been working on the Valmy job for Stone & Webster at various times in 1981, and Mr. Palmer also claims to have previously observed Mr. Hughes' work for another contractor on the Valmy smokestack. On the other hand,

Mr. Noland had not worked on the Valmy job in 1981, and the evidence is questionable as to any previous work by him on the project. While the Court might conclude that Mr. Hughes was a better craftsman than plaintiff, there is little credible evidence, on the basis of what Mr. Palmer had been able to observe, that Mr. Noland was a better cement mason than plaintiff.

The testimony of all other witnesses was that plaintiff was skilled in all areas of the work of a concrete mason, and did not have the deficiencies in ability which were claimed by Mr. Palmer. Defendant Roland Christensen has been Secretary-Treasurer of the Union and its Business Agent for 17 years. He never received any complaints relative to plaintiff's skills. It appears that Mr. Christensen has, through all the time plaintiff was a member of the Union, been responsible to dispatch masons to the jobs. Therefore, he would have heard about any complaints made by employers or others relative to plaintiff's skills. There is no sign that plaintiff was dispatched to jobs for assignment only in patching, wall or grinding work. Rather, the preponderance of the evidence is that plaintiff worked on all kinds of jobs and assignments.

James Brown, called as a witness by the Union, testified he had not heard any complaints about plaintiff's ability or skills as a cement mason. Mr. Brown worked side by side with plaintiff for nearly ten months at Valmy. He was a long time skilled cement mason and would have observed deficiencies in plaintiff's skills or that plaintiff was assigned only to certain types of work.

James E. Smith was called as a witness by plaintiff. He is an experienced foreman of labor crews which handle the pouring of concrete. He has observed the work of many cement masons. Mr. Smith worked on the same Valmy assignments as plaintiff and had ample opportunity to observe plaintiff's work. His testimony was to the effect that plaintiff had proper skills as a mason.

Plaintiff was a concrete finishing foreman on the high rise Harrah's parking garage on Second Street in Reno. It is a

large concrete structure. He also worked as a cement mason on the Harrah's Center Street parking garage, the Reno Hilton hotel, the Veterans Administration hospital addition, and the Reno-Sparks sewer plant.

The preponderance of the evidence is that plaintiff was a skilled cement mason and that he was qualified to do the work which Stone & Webster had scheduled to be done at the time of his termination. Further, the evidence demonstrates that plaintiff was at least as skilled as the two crew members who were retained at the time of his discharge.

Plaintiff has an admitted history of narcolepsy since 1945. According to the testimony of all the witnesses (including plaintiff), except Mr. Palmer, this affliction did not affect plaintiff's work on the job as a cement mason. The effect of the narcolepsy was that plaintiff had a tendency to fall asleep after being on the job and then taking a break, such as for lunch. Apparently this did happen to plaintiff on a number of occasions during breaks. Mr. Palmer claims he found plaintiff asleep "on the job a couple of times." Nevertheless, the Court finds from the evidence that the narcolepsy did not adversely affect plaintiff's job performance.

While there were few blacks on the Valmy job, there is no credible evidence that Stone & Webster had any company policy or custom to discriminate in employment practices on a basis of race. Reporting methods of Stone & Webster indicate a consciousness of the desirability of treating all persons on an equal basis.

After plaintiff was terminated, James E. Smith inquired of Mr. Palmer and the other cement masons as to why plaintiff had been laid off. No one would give him an explanation. The reason given by Stone & Webster has been RIF. Mr. Smith's testimony was that it appeared to him to be a one person RIF. The RIF contention doesn't hold up under scrutiny, and the Court finds it to be pretextual. The cement finishing crew was not being reduced in numbers to a point where it was necessary to lay off plaintiff. Plaintiff had the most seniority on the crew, next to the foreman, and the crew was retained for a considerable period of time thereafter at a level of at least the foreman and two masons. There was no RIF.

The somewhat offhand claim that plaintiff was discharged because of his narcolepsy appears pretextual as well. The preponderance of the evidence shows that plaintiff was not discharged because he was unable to perform the job assignments as well as the other two more recently hired masons. The custom of both Stone & Webster and the Union was that the last hired was first to be laid off. On that basis plaintiff ought to have been retained.

While the work of cement masons (and this applies to plaintiff as well) is often seasonal, with lay offs being experienced in the winter, plaintiff worked straight through the 1980–81 winter at Valmy. The record before the Court indicates that, if he had not been terminated, plaintiff would have continued as an employee of Stone & Webster on the Valmy job until he retired on November 1, 1982.

 During the course of the trial the allocation of burdens and the order of presentation of proof required in a Title VII disparate treatment case were followed. *See Hagans v. Clark*, 752 F.2d 477, 481 (9th Cir.1985). Thus, the Court now must decide, as a fact, whether the defendants intentionally discriminated against the plaintiff; that is, whether he was treated less favorably than others because of his race. *U.S. Postal Service Bd. of Govs. v. Aikens*, 460 U.S. 711, 715, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983). The evidence presented shows that racial discrimination made the difference between the plaintiff's retention on the job and his termination. *See Mitchell v. Keith*, 752 F.2d 385, 391 (9th Cir.1985). The reasons given by the defendants, i.e., narcolepsy and lesser cement mason skills than those retained on the job, have been found to be pretextual. This is supportive of a finding of intentional discrimination. *See Hung Ping Wang v. Hoffman*, 694 F.2d 1146, 1148 n. 2 (9th Cir.1982). The Court must determine

which side's explanation of the employer's motivation it believes. *Casillas v. United States Navy*, 735 F.2d 338, 342 (9th Cir. 1984). The mere fact of the difference in treatment accorded plaintiff has some probative force. *E.E.O.C. v. Inland Marine Industries*, 729 F.2d 1229, 1233 (9th Cir. 1984). So does Stone & Webster's and Mr. Palmer's purported misjudgment of plaintiff's qualifications. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 259, 101 S.Ct. 1089, 1096, 67 L.Ed.2d 207 (1981). The unworthiness of credence of the defendants' explanations for the plaintiff's termination helps prove that he was the victim of intentional discrimination. *Id.* at 256, 101 S.Ct. at 1095; *U.S. Postal Service Bd. of Govs. v. Aikens*, at 460 U.S. 716, 103 S.Ct. at 1482; *Felton v. Trustees of Cal St. Universities*, 708 F.2d 1507, 1509 (9th Cir.1983). The plaintiff has established that his termination resulted from intentional racial discrimination. He, therefore, is entitled to recover back wages from the date of his discharge, August 14, 1981, to the date he retired, November 1, 1982.

At the time of his termination, Plaintiff was being paid at the rate of $12.55 per hour, plus fringe benefits. The evidence indicates that those benefits included employer contributions of $2.00 per hour in vacation pay and $1.00 per hour toward a pension plan. The total compensation, therefore was $15.55 per hour. However, 25¢ per hour was deducted for Union dues, leaving $15.30 per hour as the compensation benefits lost by plaintiff as a result of his discharge. During the ten full calendar months of his employment by Stone & Webster, plaintiff worked 1668 hours, or an average of 166.8 hours per month. Multiplying 166.8 hours times $15.30 per hour gives a result of $2552.04 per month. Plaintiff, while on the job, utilized living quarters provided by Stone & Webster. The evidence indicates that an average of $345.37 was deducted each month therefor. Subtracting this figure from $2552.04 leaves $2207.04 as the monthly compensation lost. There being 14½ months between the dates of plaintiff's discharge and

his retirement, $2207.04 is multiplied by 14½ to result in $32,002.08 in back wages recoverable by him.

█ Plaintiff did receive unemployment benefits of perhaps $8,700.00 during the 12½ months, but they may not be used as offsets against a back pay award. *Kauffman v. Sidereal Corp.*, 695 F.2d 343, 347 (9th Cir.1982).

█ The burden of proving that plaintiff failed to mitigate damages rests on the defendants. *Sangster v. United Air Lines, Inc.*, 633 F.2d 864, 868 (9th Cir. 1980). They must establish that there were suitable positions available which plaintiff could have discovered, and that he failed to use reasonable diligence in seeking them. *Jackson v. Shell Oil Co.*, 702 F.2d 197, 202 (9th Cir.1983); *Sias v. City Demonstration Agency*, 588 F.2d 692, 696 (9th Cir.1978). The burden has not been sustained in this case, therefore no mitigation of damages may be allowed.

█ Where, as here, the discriminatory action was by a supervisory employee who was authorized to participate in hiring and firing, his employer may be held liable by reason of ratification, authorization or respondeat superior. *Mitchell v. Keith*, at 752 F.2d 388-9; *Miller v. Bank of America*, 600 F.2d 211, 213 (9th Cir.1979). All three bases apply to defendant Stone & Webster in relation to the actions of its employee, defendant Palmer. In fact, only the employer may be held liable for the back wages; the individual employee may not. *Padway v. Palches*, 665 F.2d 965, 968 (9th Cir.1982); *Rolfe v. State of Arizona*, 578 F.Supp. 1467, 1472 (D.Az.1983). Only injunctive relief would be available against the employee. *Id.* Plaintiff has established his entitlement to injunctive relief against defendant Palmer, forbidding the latter from further employment discrimination against plaintiff. However, since plaintiff has retired, the need for such relief has been mooted. Therefore, the back wages award will be the only relief available, and it will run only against defendant Stone & Webster. Prejudgment interest

will not be ordered. *Cf. Domingo v. New England Fish Co.,* 727 F.2d 1429, 1446 (9th Cir.1984), *mod. on oth. gds.* 742 F.2d 520 (9th Cir.1984).

The claims of plaintiff against the Union and Mr. Christensen are not well taken. Plaintiff apparently seeks declaratory and injunction relief against these two defendants.

The gravamen of the complaint against Mr. Christensen and the Union is that they discriminated against plaintiff on account of his race in selection of a job steward, after James Brown, the steward on the job, retired at the end of July 1981.

■ A job steward for a union is the representative of the union at the jobsite. It is his responsibility to watch for and attempt to resolve problems between union members on the job and the employer relating to payroll, overtime, work assignments and misassignments. The steward at Valmy was obligated to review safety conditions on the job and, if he observed problems, to advise the company and Union officials. The steward represents the Union in its relations with the company and the other crafts.

The steward must have a working knowledge of Union procedures (as may be reflected in its Constitution and bylaws), of the rights of union members on the job, and of the employer (as reflected in this case in the Project Agreement between the unions and Stone & Webster). He should understand and, to the extent possible, be experienced in dealing with the Union, Union members on the job, and the employer.

■ The appointment of the job steward to succeed Mr. Brown was the prerogative of Mr. Christensen as Business Agent of the Union. *See* Sec. 64 of Constitution and Bylaws of Local Union No. 241. He appointed Leonard Hughes, as the person he deemed most qualified for the job. It should be noted that Stone & Webster had nothing to do with the appointment of the job steward here in question.

There is no custom to appoint the most senior worker on the job as steward. The practice is to appoint the most qualified individual. The preponderance of the evidence is that Mr. Hughes was more qualified for appointment than plaintiff. Mr. Hughes had several times previously acted as a job steward, while plaintiff had not. At the time in question Mr. Hughes was president of the Union, while plaintiff had, during his some 14 years as a member, attended only one Union meeting. Mr. Hughes has served as a union negotiator in regard to the master building trades labor contract, which is negotiated periodically between all the building trade unions and the Associated General Contractors. It covers all the contractors in the area. Mr. Hughes was familiar with the workings of the Union, the rights of Union members, and the manner of handling grievances and dealing with the Union and the employer, while plaintiff had not had such experience.

■ Black members had previously acted as job stewards for the Union on several occasions. This has some probative value as to whether the Union had a discriminatory motivation. *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 580, 98 S.Ct. 2943, 2951, 57 L.Ed.2d 957 (1978).

While the discharge of a job steward requires advance notice to the Union, and while it is obvious that the job steward has some additional job security when contrasted with other workers, it is not assured that he will be the last to be laid off in a RIF. Appointment as job steward would not have, in and of itself, prevented plaintiff's termination.

■ The preponderance of the evidence is that neither the Union nor Mr. Christensen discriminated racially against plaintiff in the appointment of Leonard Hughes as job steward, rather than plaintiff.

Finally, there is no substantial credible evidence that Mr. Christensen or the Union had anything to do with the discharge of plaintiff at Valmy.

This Memorandum Decision and Order shall constitute findings of fact and conclusions of law.

IT IS, THEREFORE, ORDERED that the Clerk shall enter judgment as follows:

(1) In favor of plaintiff and against defendant Stone & Webster in the amount of $32,002.08.

(2) In favor of defendants Roland Christensen and the Union and against plaintiff.

(3) No relief is awarded against defendant Palmer.