**Solomon WILLIAMS, et al., Plaintiffs,**

v.

**The BOEING COMPANY, et al., Defendants.**

**No. C98–761P.**

United States District Court, W.D. Washington, at Seattle.

Jan. 21, 2005.

Bruce A. Harrell, Harrell Connell Desper Hunter & Pauley, Oscar Edward Desper, III, Harrell Desper Connell & Roesch, Craig R. Spiegel, Ivy D. Arai, Jeffrey Todd Sprung, Steve W. Berman, Hagens Berman, Mary R. Mann, Mary Ruth Mann & Associates, Mark E. Brennan, Rinehart Robblee & Hannah, Harish Bharti, Seattle, WA, Steven J. Toll, Christine E. Webber, Joseph Marc Sellers, Cohen Milstein Hausfeld & Toll, Washington, DC, Alan B. Epstein, Spector Gadon & Rosen, Philadelphia, PA, for Plaintiffs.

Barbara Berish Brown, Paul, Hastings, Janofsky & Walker, Washington, DC, C. Geoffrey Weirich, Paul Hastings Janofsky & Walker, Atlanta, GA, Jeffrey Alan Hollingsworth, Sonja Lengnick, Kevin J. Hamilton, Perkins Coie, Michael Reiss, Rebecca Shapiro Cohen, Elizabeth A. Sullivan, Sheehan H. Sullivan Weiss, Harry James Franklyn Korrell, III, Davis Wright Tremaine LLP, Seattle, WA, Robert F. Porcarelli, Davis Wright Tremaine, Bellevue, WA, for Defendants.

## ORDER ON CLASS CERTIFICATION

PECHMAN, District Judge.

This matter comes before the Court on the parties' cross-motions on class certification.

(Dkt. Nos. 674, 738). Having reviewed the pleadings and supporting materials and having heard oral argument, the Court GRANTS Plaintiffs' motion in part and certifies the following class:

> African–American salaried employees employed by Heritage Boeing[1] from June 6, 1994 to the present, excluding executives and SPEEA Techs, seeking injunctive relief for racial discrimination in compensation and promotions.

It is further ordered that the litigation of the disparate treatment and disparate impact claims under Title VII will be bifurcated into a liability phase and a remedial phase. This order certifies only the liability phase and the injunctive relief portion of the remedial phase.

The liability phase will consist of a jury trial to determine liability on the disparate treatment claim and a bench trial to determine liability on the disparate impact claim. If liability is found on either claim, the Court will then order injunctive relief as necessary.

The Court does not see the wisdom in ruling on certification of the back pay or punitive damages claims at this stage of the proceedings. If liability is found under either claim, the Court will revisit the question of certifying the back pay and punitive damages portions of the remedial phase.

Certification of subclasses of the African–American hourly employees' promotions claim may be appropriate. However, based on the record, the Court cannot determine what the appropriate subclasses might be. Therefore, the Court DENIES without prejudice certification of the African–American hourly employees' promotion claim.

## PROCEDURAL BACKGROUND

In 1998, African–American employees of Boeing filed a nationwide class action against Boeing alleging three federal claims (and various state law claims not at issue here). Their federal claims alleged racial discrimination in: promotions for salaried and hourly employees ("promotions claim"), retaliation,

---

1. "Heritage Boeing" refers to The Boeing Company before it acquired additional companies in the late 1990s and 2000.

hostile work environment. This putative class included African–American employees working at all of Boeing's facilities nationwide, including those of two recently acquired companies Rockwell International and McDonnell Douglas Corporation.

Before any motions to certify the class were filed, Plaintiffs and Boeing reached a proposed Consent Decree. A group of Plaintiffs objected. On September 30, 1999, Judge Coughenour considered but rejected the objections, certified the class for settlement purposes, and approved the Consent Decree. (Dkt. No. 447). In certifying the class, the district court held that Fed. R.Civ.P. 23(a)'s four requirements of numerosity, commonality, typicality, and adequacy of representation were satisfied. Judge Coughenour's order certified the class under Rule 23(b)(2) on the grounds that the primary purpose of the lawsuit was to obtain injunctive relief. The Consent Decree certified a(b)(2) *and* a(b)(3) class.[2] The (b)(2) class, certified for equitable relief, was defined as all African–Americans employed by Boeing from the beginning of the applicable limitations periods until the expiration of the decree. The (b)(3) class, certified for monetary relief, was limited to African–Americans employed from the beginning of the applicable limitations periods until the preliminary approval date of the decree. *Staton v. Boeing Co.*, 327 F.3d 938, 947–48 (9th Cir.2003).

The objectors appealed the approval of the settlement. The Ninth Circuit affirmed the certification of the class for settlement purposes but reversed the district court's approval of the settlement on fairness grounds. *Id.* at 945. The court held that Rule 23(a)'s class certification requirements were satisfied. It noted, however, that there were "some concerns, largely relating to litigation management, as to whether the case could be maintained as a class action if the litigation continues." *Id.* at 953–60.

After the case was remanded, Plaintiffs amended their complaint to add claims for racial discrimination in compensation of salaried employees ("salary compensation claim") and discrimination in overtime for hourly employees ("overtime claim"). They allege

violations of the Civil Rights Act of 1866, 42 U.S.C. § 1981, and Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, et seq., as amended by the Civil Rights Act of 1991. (The named Plaintiffs in their individual capacities also allege various state common law claims.) (Second Amended Compl., ¶¶ 116–54). In their Second Amended Complaint, Plaintiffs seek declaratory and injunctive relief, equitable monetary relief including back and front pay, and compensatory and punitive damages.

In sum, Plaintiffs now allege racial discrimination in: 1) promotions for salaried and hourly employees, 2) compensation for salaried employees, 3) overtime for hourly employees, 4) retaliation, and 5) hostile work environment. They seek class certification of only two of these claims: promotions for salaried and hourly employees and compensation for salaried employees. In support of the promotions and the salary compensation claims, they assert disparate treatment and disparate impact theories of liability. They seek certification under Rule 23(b)(2) to obtain injunctive relief, back pay, and punitive damages. In the alternative, they seek a hybrid certification so that punitive damages could be obtained as a Rule 23(b)(3) class. Further, it appears from Plaintiffs' briefing that they do not seek certification of their § 1981 claim (all of their arguments focused on disparate treatment and impact under Title VII).

The proposed class consists of approximately 15,000 members, residing in Alabama, California, Kansas, Missouri, Nebraska, Oklahoma, Pennsylvania, and Washington. (Second Amended Compl., ¶ 47). Boeing estimates that the class as proposed by Plaintiffs would include up to 22,000 members. Plaintiffs propose certification of a class comprised of all African–Americans employed by Heritage Boeing from June 6, 1994 to the present and all African–Americans employed by non-heritage Boeing from the time Boeing acquired various companies to the present. They do not propose any subclasses.

---

**2.** There appears to be a discrepancy between Judge Coughenour's order and the Consent Decree regarding which Rule 23(b) category of class was certified.

## FACTUAL BACKGROUND

Over the course of the proposed class period, Boeing acquired three companies (collectively, "non-Heritage Boeing"): 1) Rockwell International (later named Boeing North American, Inc. ("BNA")), acquired in December, 1996, 2) McDonnell Douglas Corporation ("MDC"), acquired in August, 1997, and 3) portions of Hughes Electronics ("Hughes"), acquired in January, 2000. BNA had facilities in southern California and Tulsa, Oklahoma. MDC had facilities in southern California, St. Louis, Missouri, and Arizona. Hughes had facilities in southern California.

Boeing presents evidence that it did not immediately change the personnel practices and policies used at BNA, MDC, and Hughes when it acquired these companies. BNA followed different compensation practices and guidelines, including using its own job classification system, with salary ranges for each classification, and salary planning practices, with salary ranges and a formula to determine increases, until 2000. It was bound by collective bargaining agreements ("CBAs") that Rockwell International and various unions had entered (it is not clear how long these CBAs governed). MDC retained its own job classification system until 1999. Until as late as 2001, it was bound by CBAs that it had entered with various unions prior to the acquisition. Hughes used its own personnel practices and procedures, including promotion and compensation rate structures until March, 2003.

Boeing is currently divided into different business units: Boeing Commercial Airplanes, Integrated Defense Systems (a Space & Communications unit and a Military Aircraft & Missile unit were merged into this integrated defense unit in 2002), a Shared Services Group that provides a wide variety of support services to the two major business units, and a few smaller business units (e.g. Phantom Works, doing research and development, and the Company Headquarters). As of 1998, Boeing Commercial Airplanes was located in Puget Sound, Tulsa, Wichita, and Long Beach. Integrated Defense Systems was located in Kent, southern California, St. Louis, Arizona, Philadelphia, and Wichita. The Shared Services Group was located in Seattle, southern California, St. Louis, and Wichita.

## ANALYSIS

To qualify for certification as a class, Plaintiffs must satisfy the requirements set out in Rule 23(a) and the class must fall under one of the categories outlined in Rule 23(b).

### I. *Rule 23(a)*

Rule 23(a) requires that the plaintiffs show that 1) the putative class is numerous, 2) there are common questions of law and fact, 3) the claims of the named plaintiffs are typical of those of the absent class members, and 4) the named plaintiffs and counsel will adequately protect the interests of the absent class members.

Here, the Ninth Circuit affirmed class certification for settlement purposes. In doing so, the court noted that "when, as here, the parties have entered into a settlement agreement before the district court certifies the class, reviewing courts must pay 'undiluted, even heightened,' attention to class certification requirements." *Staton,* 327 F.3d at 952 (quoting *Amchem Prods. Inc. v. Windsor,* 521 U.S. 591, 620, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)). The Ninth Circuit analyzed each of the four requirements in Rule 23(a) and found that the class satisfied all of them.

First, the court found that numerosity was easily satisfied because the Plaintiff-class on appeal had 15,000 members. *Id.* at 953. Here, the Plaintiff-class is equally numerous.

In discussing commonality, the court noted that the class

> is broad and diverse. It encompasses some 15,000 employees, from a wide range of positions both salaried and hourly, who are employed at Boeing facilities located in 27 different states.... [T]he district court found[ ] that the large class is united by a complex of company-wide discriminatory practices against African–Americans.... [T]he breadth and consistency of class counsel's initial evidence [of company-wide discriminatory practices] places the district court's finding of commonality well within that court's discretion.

*Id.* at 953–54. The court concluded that Boeing's acquisition of BNA and MDC during the class period, which brought employ-

ees from BNA and MDC into the class, did not undermine commonality. While "[s]ome of the class's historical evidence from BNA and MDC employees may extend to before the mergers, ... the kernel of the class complaint is that a complex of discriminatory practices pervades Boeing *today* and in the recent past. The fact of the mergers does not bar a finding of commonality." *Id.* at 954 (emphasis in original). Further, Plaintiffs produced evidence of centralized decision making, which, according to the Ninth Circuit, trumped the fact that some employment decisions were made locally. *Id.* at 956. Still, the court noted that the district court could have certified sub-classes rather than one class so as to assure commonality. *Id.*

The court concluded that the named Plaintiffs were sufficiently typical of the absent class members because the named Plaintiffs included salaried and hourly employees, management and line-workers, union and non-union, as well as employees from all of Boeing's locations. *Id.* at 957. The court also found that the named Plaintiffs and class counsel adequately represented the class members. *Id.* at 957–58.

To the extent that the currently proposed class is the same as or smaller than the class that was before the Ninth Circuit on appeal, the teaching of *Staton* is that Rule 23(a)'s four requirements for class certification are met. *See Amchem,* 521 U.S. at 620, 117 S.Ct. 2231 (courts must pay "undiluted, even heightened," attention to class certification requirements when certifying a settlement class). Plaintiffs, however, seek to enlarge the class in three ways: first, by adding the salary compensation claim[3] (which could bring in additional salaried employee class members to whom the other claims did not apply); second, by including African–American employees from Hughes, which Boeing had not acquired when the Consent Decree was approved, and; third, by changing the start date in the class definition. The class approved by Judge Coughenour included African–Americans who began working at "the beginning of the applicable limitations peri-

ods"; the currently proposed class would include African–Americans who began working as early as June 6, 1994. Plaintiffs conceded at oral argument that this change in the start date could bring in additional class members.

While the proposed class is potentially larger than it was on appeal, the Court finds that there is no reason why the addition of the salary compensation claim or the modified start date would change the Ninth Circuit's 23(a) analysis.[4] Therefore, this Court adopts the Ninth Circuit's Rule 23(a) analysis and concludes that Rule 23(a)'s requirements have been met, notwithstanding the additional claim and modified start date.

## II. Rule 23(b)

Plaintiffs seek certification of a nationwide class under Rule 23(b)(2) for injunctive relief, monetary equitable relief of back pay, and punitive damages. In the alternative, they seek (b)(2) certification for injunctive relief and back pay and (b)(3) certification for punitive damages. Rule 23(b)(2) provides for certification when "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief ... with respect to the class as a whole." A Rule 23(b)(2) class is intended for situations when broad class-wide injunctive relief is necessary to redress group-wide injury. *Robinson v. Metro–North Commuter R.R. Co.,* 267 F.3d 147, 162 (2d Cir.2001).

The main consideration in determining whether a class should be certified under Rule 23(b)(2) or (3) is whether the predominate relief sought is injunctive or monetary. Rule 23(b)(2) classes can include claims for monetary relief so long as the predominate relief sought is injunctive. *Molski v. Gleich,* 318 F.3d 937, 947 (9th Cir. 2003). Here, Plaintiffs seek certification to obtain injunctive relief, back pay, and punitive damages. As a threshold issue, back pay is an equitable remedy and therefore

---

**3.** This Court recently held that Plaintiffs did not allege the salary compensation claim in their original or First Amended Complaints (filed before the Consent Decree was approved). (Dkt. No. 793).

**4.** Because the Court excludes the employees from Hughes from the class, the potential problem presented by adding these new class members is moot.

falls within the ambit of Rule 23(b)(2). *See Gotthardt v. Nat'l R.R. Passenger Corp.*, 191 F.3d 1148, 1153 (9th Cir.1999); *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 415 (5th Cir.1998) (noting that back pay could be sought in a(b)(2) class action "because, as an equitable remedy similar to other forms of affirmative injunctive relief permitted in (b)(2) class actions, it [is] an integral component of Title VII's 'make whole' remedial scheme") (citing *Pettway v. Am. Cast Iron Pipe Co.*, 494 F.2d 211, 252, 257 (5th Cir. 1974)). Therefore, the relevant question here is whether Plaintiffs primarily seek injunctive and equitable relief or punitive damages.

In *Molski*, the Ninth Circuit rejected utilizing a bright-line rule in determining which form of relief predominates and instead directed the district court to examine the facts and circumstances of each case, specifically the intent of the plaintiffs in bringing the suit. *Id.* at 949–50. The Second Circuit applied a similar standard in *Robinson*, in which African–American employees sued their employer for employment discrimination, alleging both disparate treatment and disparate impact and seeking certification under Rule 23(b)(2). The employer argued that certification under Rule 23(b)(2) was inappropriate because plaintiffs also sought monetary damages. The court rejected this bright-line approach, holding that the inclusion of monetary damages in the types of relief sought does not automatically make monetary damages predominate. Instead, the court pointed to two considerations that the district court on remand should look to in determining what form of relief predominated: 1) would the plaintiffs have likely brought suit to obtain injunctive relief even if they had no prospect of a monetary recovery, and 2) would injunctive relief be reasonably necessary and appropriate if the plaintiffs were to succeed on the merits. *Robinson*, 267 F.3d at 164.

Further, if a court finds that injunctive relief predominates and certifies a(b)(2) class, the court has the discretionary power under Rule 23(d)(2) to require notice and the right to opt out when adjudicating the monetary relief aspects of the action. As such, the court can protect the due process rights of the absent class members. *Molski*, 318 F.3d at 947–48.

■ Here, these two considerations favor a(b)(2) class. Plaintiffs present declarations from numerous named Plaintiffs stating that their primary objective in this action is injunctive relief. Further, if Plaintiffs succeed on the merits, injunctive relief remedying Boeing's discriminatory employment practices would be both reasonably necessary and appropriate. Plaintiffs contend that, because Boeing's company-wide policies and practices allow and foster racial discrimination, only company-wide injunctive relief can remedy the discrimination.[5] (Plfs.' Mot. at 24). Boeing counters that there is no policy applicable to the class as a whole for the court to enjoin. Defendant's argument on this point is not persuasive. If Plaintiffs succeed under either the disparate treatment or disparate impact claim, they will have necessarily shown that there was a discriminatory company-wide policy or practice for which class-wide injunctive relief will be appropriate and necessary. *See Califano v. Yamasaki*, 442 U.S. 682, 702, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979) ("the scope of injunctive relief is dictated by the extent of the violation established").

The Court is not persuaded by Boeing's arguments that monetary relief predominates. First, Boeing contends that 60% of the proposed class members no longer work at Boeing and therefore they could only want monetary relief. (It may actually be less than 60% because after Boeing made this assertion Plaintiffs restricted the proposed class to exclude employees who worked for BNA, MDC, or Hughes but left before those companies were acquired.) Even if Boeing's contention is true, this case was originally filed in 1998. In all likelihood, a higher percentage of the proposed class worked for

---

5. Plaintiffs point to the Ninth Circuit's observation in *Staton* that Plaintiffs' counsel had gathered evidence through interviews, documentation, and Boeing's internal studies of affirmative action issues to demonstrate that discriminatory practices at Boeing are widespread and entrenched, and that the breadth and consistency of this evidence supported a finding of commonality. *Staton*, 327 F.3d at 954.

Boeing in 1998. The mere fact that this case has been in litigation for so many years during which the economy has changed and Boeing has laid off many employees (not to mention others who have retired) cannot be held against Plaintiffs and provides no reason to assume that their motivation has changed from the time they originally filed suit.

Second, Boeing argues that Plaintiffs' request for back pay, front pay, compensatory and punitive damages shows that monetary damages predominate. This argument is belied by the fact that Plaintiffs do not seek certification to obtain compensatory damages and back pay/front pay is equitable relief that falls under (b)(2).

Third, Boeing argues that Plaintiffs' failure to point to any specific injunctive relief that they want makes it impossible to tell if injunctive relief predominates. Boeing, however, has not pointed to any authority that requires Plaintiffs to outline in detail their sought-after injunctive relief at this early stage in order to show that injunctive relief is their primary goal in bringing the lawsuit. Apart from Boeing's argument, the Court initially questioned whether the injunctive relief agreed to in the *Beck v. Boeing* settlement addressing gender discrimination accomplishes the same goals by the same means as what Plaintiffs seek here such that injunctive relief is not necessary in this case. (See *Beck v. Boeing*, CV00-301P, Consent Decree). At oral argument, Plaintiffs indicated that they seek broader relief than was obtained in *Beck*. To support this position, Plaintiffs presented at oral argument a multipart proposal regarding needed injunctive relief.

In sum, the Court finds that certification under Rule 23(b)(2) is appropriate. However, the Court finds that management and prudential issues necessitate limiting the class as described below.

### III. Manageability

The Ninth Circuit's decision in *Staton* did not discuss class certification under Rule 23(b). However, the Supreme Court made clear in *Amchem* that class certification for settlement purposes requires meeting all of Rule 23's requirements except for Rule 23(b)(3)(D)'s manageability requirement. *Amchem*, 521 U.S. at 620, 117 S.Ct. 2231.

Based on this principle and because Boeing supported certification under both Rule 23(b)(2) and (3) in seeking approval of the Consent Decree, Plaintiffs argue that Boeing is judicially estopped from arguing against certification now except as to manageability. The Seventh Circuit confronted a similar situation in *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656 (7th Cir.2004). There, the parties sought and obtained certification and settlement approval at the same time, the settlement was reversed on appeal, and defendants then argued on remand that certification was inappropriate. The Seventh Circuit held that defendants were precluded by the doctrine of judicial estoppel from challenging certification of a settlement class because they had previously supported it and had benefitted by it. *Id.* at 660–61. The court noted however that defendants could challenge the manageability of the class. *Id.* at 661. Language in the Ninth Circuit's *Staton* decision supports this approach. The court stated "[a]lthough we have some concerns, largely relating to litigation management, as to whether the case could be maintained as a class action if the litigation continues, the district court did not abuse its discretion in certifying the case for settlement purposes pursuant to Rule 23." *Staton*, 327 F.3d at 953. Boeing did not respond to Plaintiffs' judicial estoppel argument, but nonetheless framed its argument in terms of manageability.

■ Manageability is relevant for Rule 23(b)(2) classes as well as Rule 23(b)(3) classes, notwithstanding the fact that the rule does not explicitly require an analysis of manageability in certifying a Rule 23(b)(2) class. *See Dukes v. Wal–Mart Stores Inc.*, 222 F.R.D. 137, 173 (N.D.Cal.2004) (applying the manageability requirement to a 23(b)(2) class because manageability is "implicit in any type of class certification") (citing *Robinson*, 267 F.3d at 164).

Plaintiffs allege that Boeing had and still has company-wide policies and practices granting local managers excessive subjectivity in determining promotions for salaried and hourly employees and compensation for salaried employees, which has allowed and even fostered racial discrimination. Plaintiffs further allege that Boeing knew that its promotions and salary compensation policies and

practices adversely affected African–American employees, but that Boeing failed to remedy the problem. According to Plaintiffs, these company-wide policies and practices are the basis for nationwide class certification for the promotions and salary compensation claims. In contrast, Boeing argues that there is no basis to certify a nationwide or even a Puget Sound-based class because its promotion and salary compensation practices and policies are too diverse over Boeing's different business units, job categories, locations, and collective bargaining agreements. As such, Boeing maintains that the class would not be manageable.

Plaintiffs assert both disparate treatment and disparate impact claims. Disparate treatment claims assert that the employer utilizes a pattern or practice of intentional discrimination which is the employer's standard operating procedure. *Robinson*, 267 F.3d at 158 (citing *International Broth. of Teamsters v. U.S.*, 431 U.S. 324, 366, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977)). In contrast, disparate impact claims assert that the employer has a facially neutral policy or practice that causes a disparate impact on a protected group, even if the employer has no intent to discriminate. *Robinson*, 267 F.3d at 160 (citing *Griggs v. Duke Power Co.*, 401 U.S. 424, 432, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971)). Disparate impact liability is premised on the idea that "some employment practices, adopted without a deliberately discriminatory motive, may in operation be functionally equivalent to intentional discrimination." *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 987, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988). Generally, litigation of both disparate treatment and disparate impact claims are divided into two phases: liability and remedial. *Robinson*, 267 F.3d at 158. (There are two important features of disparate treatment claims that are absent for disparate impacts claims: 1) punitive damages are available, and 2) either party may request a jury trial. Here, Plaintiffs seek punitive damages and have requested a jury trial.)

### A. Manageability of the Liability Phase of the Disparate Treatment Claim

■ At the liability phase, plaintiffs must provide evidence sufficient to establish a prima facie case of a pattern or practice of intentional discrimination. In class actions, plaintiffs usually present both statistical evidence and anecdotal testimony from class members. The focus is "on matters relevant to the class as a whole ...." *Dukes*, 222 F.R.D. at 174. Plaintiffs need not present evidence during the liability phase that each member of the class was a victim of the employer's discriminatory policy or practice. *Teamsters*, 431 U.S. at 360, 97 S.Ct. 1843; *see Beck v. Boeing*, 60 Fed.Appx. 38, 39 (9th Cir.2003). If plaintiffs succeed in making a prima facie case, the burden shifts to the defendant employer either to prove that plaintiffs' evidence is inaccurate or insignificant, or to present evidence of legitimate non-discriminatory reasons for the disparate treatment. *Teamsters*, 431 U.S. at 360, 97 S.Ct. 1843; *Domingo v. New England Fish Co.*, 727 F.2d 1429, 1435 (9th Cir.1984). Because plaintiffs need not prove that each member of the class was a victim of the discriminatory policy and instead present evidence applicable to the class as a whole, defendant's rebuttal should likewise focus on class-wide evidence, not on individual employment decisions. *Id.; see Beck*, 60 Fed. Appx. at 39. "The point is that at the liability stage of a pattern-or-practice trial the focus will *not* be on individual [employment] decisions, but on a *pattern* of discriminatory decision making." *Teamsters*, 431 U.S. at 360 n. 46, 97 S.Ct. 1843 (emphasis added). In *Beck*, the Ninth Circuit noted that this meant that Boeing could not defeat class certification of the liability phase by arguing that it is entitled to introduce individualized evidence that each of its employment decisions was motivated by a legitimate nondiscriminatory reason. 60 Fed.Appx. at 39.

Plaintiffs contend that there is evidence applicable to a nationwide class of Boeing's practices of intentional discrimination in promotions for hourly and salaried employees and in compensation for salaried employees. This evidence can be broken down into three general categories: statistical analysis, Boeing's internal studies of equal employment opportunity issues, and anecdotal evidence by named representatives.

### i. Claims by Salaried Employees

Plaintiffs' statistical expert, Dr. Bernard Siskin, maintains that African–American salaried employees have historically received, to a statistically significant degree, lower pay and fewer promotions than whites.[6] To analyze compensation for salaried employees, Dr. Siskin aggregates salaried employees into the following groups: 1) exempt/non-exempt employees, 2) managers, 3) engineers, and 4) SPEEA Techs. (Siskin Decl., Tables 1–4). He analyzed how each of these groups fared in different Boeing "entities" (which consist primarily of Heritage Boeing, BNA, MDC, and BSS (formerly Hughes)). He concludes that for each of the first three groups, there were statistically significant disparities for years 1995, 1999, 2000, 2001, 2002, and 2003 (he did not analyze 1996, 1997, or 1998). To analyze promotion shortfalls, Dr. Siskin aggregates salaried employees into the following groups: 1) exempt employees, 2) non-exempt employees, 3) engineers, and 4) SPEEA Techs. (Id., Tables 6–10). He analyzed how each of these groups fared in different Boeing "entities" for the period 1995–2003. He concludes that there are statistically significant promotion shortfalls experienced by African–American employees for a majority of the Boeing entities.

Boeing challenges Dr. Siskin's statistical analysis and conclusions as not credible. According to Boeing, Dr. Siskin wrongly ignored the different levels of workers in each of these groups, which correspond to the different level of work performed. These differences are represented by Boeing's Salaried Job Classification ("SJC") system.[7] For example, Boeing contends that Dr. Siskin ignored the different SJC level of engineers. As support, Boeing points to a decision by Judge Lasnik in *Nouri v. Boeing*, CV99–1227L, in which a class of Asian–American engineers relied on a statistical analysis by Dr. Siskin to support their disparate treatment and disparate impact claims against their employer Boeing. After the jury trial on the disparate treatment claims, Judge Lasnik ruled on the disparate impact claim. In that ruling, he found fault with Dr. Siskin's analysis because Judge Lasnik concluded that SJC levels needed to be taken into account in determining whether the class was disparately impacted in their salaries. "Memorandum of Decision on Disparate Impact Claim" at 2–3 (June 4, 2004).

While this Court may or may not ultimately reach the same conclusion as Judge Lasnik, it would be improper to import his conclusion into this class certification analysis. He reached that conclusion in the final merits stage of the case, not during class certification. Regardless of the merits of Boeing's argument, "[s]tatistical dueling" is "not relevant to the [class] certification determination." *Caridad v. Metro–North Commuter R.R.*, 191 F.3d 283, 292 (2d Cir.1999). Even if Boeing's challenge is fatal to Plaintiffs' case at the merits stage, "it is improper to advance a decision on the merits to the class certification stage." *Staton*, 327 F.3d at 954 (quotation and citation omitted).

Additionally, Plaintiffs point to evidence that purportedly shows that Boeing had company-wide policies and practices regarding salaries and promotions, which provided only minimal guidelines but essentially gave all discretion to local managers.[8] (Berman

---

6. Dr. Siskin did not find adverse salary or promotional disparities for African–American SPEEA Techs (certain technical workers employed in the Puget Sound). (See Siskin Decl., Table 4). For this reason, SPEEA Tech employees are excluded from the class.

7. The Court notes, however, that Boeing's internal studies analyzing salaries and promotions of minorities and women (discussed below) did not aggregate by SJC levels.

8. Boeing argues that giving managers excessive subjectivity cannot provide the basis for disparate treatment or disparate impact liability because "subjectivity" is not an employment policy or practice. (Defs.' Resp. at 6–7). While it is true that the existence of a policy granting subjectivity or discretion to individual managers is not in and of itself discriminatory, courts have recognized that the use of subjectivity is an employment practice that can be used in a discriminatory manner. *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 990–91, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988); *General Telephone v. Falcon*, 457 U.S. 147, 159 n. 15, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). *But see Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1285 (9th Cir.2000) ("While a subjective evaluation system can be used as cover for illegal discrimination, subjective evaluations are not unlawful per se and their relevance to proof of a discriminatory intent is

Decl., Ex. 23). Boeing's compensation policy or "philosophy" was to determine salaries based on performance. As of 1999, Boeing issued annual "Salary Review Process Management Guidelines" for salary planning which directed managers to determine salaries based on performance. (Id., Exs. 25–28). Beyond these general guidelines, local managers working in "Salary Review Groups" had discretion to set salaries. Boeing had similar policies regarding promotions that, according to Plaintiffs, placed few restrictions on managers. (Id., Exs. 36–38).

A Boeing DAS/PAT team created in the late 1990s studied discrepancies in compensation, promotions, and other employment practices affecting salaried and hourly employed minorities and women. The DAS/PAT team identified company-wide causes of those discrepancies.[9] (Id., Exs. 2–12, 21–22). Plaintiffs maintain that additional evidence shows that Boeing executives knew of the disparate impact on African–American employees, yet failed to take remedial measures. (Id., Exs. 13–16). According to Plaintiffs, this shows that the upper echelon of the corporation was at least complicit in allowing discriminatory practices to continue.

■ The Court finds that a class of all African–American salaried employees of Heritage Boeing nationwide is warranted. Plaintiffs' theory of the case is premised on their ability to prove that there was a practice of discrimination that permeated all divisions and levels of Boeing nationwide, and that, at the highest levels of the corporation, Boeing knew that racial discrimination was occurring and did nothing or not enough to remedy the problem. Liability will hinge on this central factual question. While Boeing may attempt to present evidence on rebuttal that "job-related criteria guide[s] compensation and promotions decisions," (Defs.' Resp. at 6), this does not undermine the central factual question upon which Plaintiffs' theory of the case hinges.

To rebut Plaintiffs' case, Boeing can attack the merits of Plaintiffs' statistics. This "statistical dueling" will be no less manageable for a nationwide class than it would be for a regional class or a class consisting of only one business unit. While this may call on the jury to evaluate complex statistical evidence presented by each side's expert, it is not uncommon to require juries to answer such complex factual questions.

Boeing's argument that "the liability phase will require examination of tens of thousands of individual compensation and promotions decisions," (Defs.' Resp. at 3), is without merit. As noted above, the liability phase is not the stage at which Boeing will argue that each individual employment decision was taken for legitimate non-discriminatory reasons. Because the evidence during the liability phase focuses on whether Boeing used a pattern of discriminatory decision making, Boeing is "expected to respond to plaintiffs' pattern and practice claim on a class-wide basis." *Dukes*, 222 F.R.D. at 174 (citing *Teamsters*, 431 U.S. at 360 n. 46, 97 S.Ct. 1843).

■ The Court excludes from the class non-Heritage Boeing African–American employees because the Court finds that proving liability for the practices that occurred at these entities after they were acquired by Boeing would be unmanageable. Even after Boeing acquired each of these companies, they continued to use their own employment and personnel practices for a number of years: MDC until 1999 even though it was acquired in 1997, BNA until 2000 even though it was acquired in 1997, and Hughes until 2003 even though it was acquired in 2000. Moreover, it appears that the conversion to using Boeing's practices and policies occurred over a period of time rather than at one definitive moment. Different practices and policies were adopted at different times. For example, Boeing asserts that these entities retained their own job classification systems until Boeing standardized classifications in 1999. Yet, BNA still used its own salary planning practices until 2000. (Defs'

---

weak.") (quotation and citation omitted). Even if a policy of granting excessive subjectivity to local managers is of "weak" relevance in proving discrimination, it is a sufficient basis to support class certification.

9. Boeing challenges the import of these studies, arguing that the DAS/PAT study was incomplete, based on limited data, etc. This argument goes to the merits of this claim, not class certification.

Ex. 43 (Culp Decl., ¶ 8)). Including employees of these non-Heritage Boeing entities would lead to litigation of an unmanageable number of corollary issues regarding when different policies were brought in line with Boeing's and what degree of oversight or control Boeing exercised during this transition period. Similarly, there would be factual issues unique to these employees regarding their salary compensation claim. The salaries of the class members who worked for these entities when Boeing acquired them were set by these entities before Boeing acquired them, which is directly relevant to their compensation claim since the initial determination of their salaries were made before acquisition. All of these issues would bear directly on Plaintiffs' ability to prove Boeing's liability for the practices and policies at those facilities. Not only would these issues present manageability problems in terms of discovery and dispositive motions, but more significantly, they would present significant manageability problems at the jury trial. The volume of the evidence alone would be unmanageable.

The Court notes that its holding here does not leave the non-Heritage Boeing African–American employees without alternatives. The Ninth Circuit noted in *Staton* that "Boeing is responsible for the employment practices of all its sub-parts." 327 F.3d at 954. As Plaintiffs point out, Boeing's internal studies regarding pay and promotion disparities included MDC and BNA such that Boeing executives knew of the compensation and promotion disparities at these facilities and failed to remedy the problem. While Boeing may ultimately be responsible for the practices at non-Heritage Boeing facilities, that fact does not lessen the significant manageability problems that including these entities would present.

The Court's holding that manageability necessitates carving out non-Heritage Boeing employees does not undermine the rationale behind the certification of nationwide class of Heritage Boeing salaried employees. The claims by the Heritage Boeing employees do not present the contentious timing issues described above.

*ii. Claims by Hourly Employees*

The claims by hourly employees present unique issues which the Court must address separately. Promotions of hourly employees are governed by CBAs. According to Boeing, there are currently 65 different CBAs connected to 65 local chapters of approximately 20 different unions operating in Boeing's facilities. Plaintiffs contend that, even though there are and were different CBAs applicable for different sets of hourly employees, the rules for promotions were similar across Boeing because they imposed few restrictions on local managers' discretion. Boeing argues that there is no policy of subjectivity for awarding promotions to hourly employees because the CBAs prescribe objective criteria and preclude subjective decision making. (Defs' Resp. at 6). Apart from the merits of each side's argument, determining liability will necessarily require analysis of the relevant CBAs to determine how promotions for hourly employees were to be determined under the different CBAs. Because there are 65 different CBAs currently in place, plus any previous CBAs that were used at any of the facilities during the class period, grouping all of the hourly employees together in one class to assert their promotions claim would be unmanageable.

Nonetheless. it may be appropriate to certify subclasses for this claim. It may be the case that each CBA covers a significant enough number of African–American hourly employees such that different subclasses of hourly employees would be possible. However, the Court cannot determine based on the materials submitted what those subclasses might be. For example, the Court has not found anything in the record identifying the number of putative class members governed by each of the CBAs. Because the Court was not provided with sufficient information to create subclasses of hourly employees by CBA, it cannot do so.

Lastly, Boeing did not dispute the proposed start date in its response. Therefore, the Court will certify the class with the start date for Heritage Boeing employees as proposed by Plaintiffs. However, the Court will modify the start date in the class definition as needed.

### B. Manageability of the Remedial Phase of the Disparate Treatment Claim

█ If plaintiffs are successful in the liability phase, the case then enters the remedial phase. Here, if Plaintiffs are successful, the necessity of class-wide injunctive relief will outweigh any manageability problems that might arise. Therefore, the Court certifies the injunctive relief portion of the remedial phase.

█ If plaintiffs seek back pay, each plaintiff enjoys the benefit of a presumption that "any particular employment decision, during the period in which the discriminatory policy was in force, was made in pursuit of that policy." *Teamsters*, 431 U.S. at 362, 97 S.Ct. 1843. The defendant employer has the burden of demonstrating that the individual plaintiff was subject to the adverse employment practice for legitimate non-discriminatory reasons. *Id.* If the employer is unsuccessful, the individual plaintiff is entitled to equitable relief of back pay. *Robinson*, 267 F.3d at 160.

Plaintiffs assert that certification of the remedial phase is appropriate because Dr. Siskin has devised a formula to determine back pay for promotion and compensation shortfalls on a class-wide basis and to allocate it to individual class members. (See Siskin Decl., ¶¶ 19–21, 28). In contrast, Boeing argues that it will introduce evidence that each challenged employment decision with respect to each individual class member was taken for lawful non-discriminatory purposes. This will be an individualized and fact-specific inquiry and as such, Boeing argues, it will be unmanageable for 22,000 class members. (Defs.' Resp. at 4).

Courts have used formulas to determine and allocate back pay. In *Domingo*, the Ninth Circuit held that back pay could and should be calculated on a class-wide basis using a formula given the nature of the discrimination at issue, · not withstanding the traditional practice of determining individual back pay awards. *Domingo*, 727 F.2d at 1444. Because the employer in *Domingo* had no objective criteria for hiring, recruitment, or promotions, and determining back pay would have called for a "quagmire of hypothetical judgments," the court found that a class-wide approach to determining back pay was needed. *Id.* (citing *Pettway*, 494 F.2d at 259).

In a more recent case, a district court certified a class of women employees of Wal–Mart stores nationwide alleging gender discrimination in promotions and pay. The court certified almost all of the remedial phase of the disparate treatment claim, relying in large part on *Domingo*. *Dukes*, 222 F.R.D. at 175–86. The parties there made similar arguments as the parties here do. *Id.* at 175. The district court noted that individual hearings would be not only unmanageable but unfruitful because it would have been impossible to determine which class members would actually have been promoted (since not all of them could have been). Therefore, the use of a formula was appropriate so long as each class member could show that she met the qualifications for the promotion and was interested in being promoted. However, the court limited the use of the formula to instances when there was objective data regarding each claimant's qualifications (which there was because of Wal–Mart's comprehensive informational technology system tracking information on each employee) and interest (which there was only for promotional opportunities that were posted on Wal–Mart's system, but which did not exist for jobs that were not posted). As such, the court certified only those back pay claims for promotions for which such data was available. The court denied certification of back pay claims where such data was not available because it concluded that determining individual back pay in those instances would have been unmanageable. The court also certified the claims for back pay for compensation because there was objective data on the amount class members would have earned if not for Wal–Mart's discriminatory policies.

While *Dukes'* analysis of this issue is attractive, it is as yet an untested analysis. Therefore, the Court finds that it is prudent to refrain from deciding that issue at this stage in the proceedings. The Court does not know if the same type of objective data exists in this case. Moreover, once the liability phase has been concluded, the Court will

be in a better position to determine whether certification is appropriate.

Lastly, certification of the punitive damages claim depends on how the Court handles back pay. In *Beck*, this Court certified a two-phase trial: phase one under Rule 23(b)(2) for determining liability and injunctive relief and phase two under Rule 23(b)(3) for determining punitive damages. The Court denied certification of the back pay claim. The Ninth Circuit affirmed certification for determining liability and injunctive relief, but reversed certification for determining punitive damages, on the grounds that disparate treatment liability does not automatically entitle every class member to punitive damages. Rather, to receive punitive damages, each class member must have suffered actual harm as a result of defendant's unlawful behavior. Because the back pay claim was not certified, nothing in phase one would have established individual harm. 60 Fed.Appx. at 39–40. Consequently, unless the Court certifies the back pay claim in this case, it would be inappropriate to certify the punitive damages claim. The Court determines that, like the back pay claim, it is prudent refrain from deciding this issue until the liability phase has concluded.

In sum, the Court certifies the liability phase and the injunctive relief portion of the remedial phase of the disparate treatment claim and will withhold from ruling on certification of the back pay and punitive damages portions of the remedial phase of the disparate treatment claim. The Second Circuit in *Robinson* recommended following such a course. It noted that even if the remedial phase proved uncertifiable on remand, the district court should bifurcate the liability and remedial phases of the disparate treatment claim and certify the liability phase because it would "reduce the range of issues in dispute and promote judicial economy." 267 F.3d at 167–68.

### C. Disparate Impact Claim

■ To allege disparate impact, plaintiffs must first make a prima facie showing that the employer uses an employment policy or practice that causes a disparate impact on a protected group. § 2000e–2(k); *Watson*, 487 U.S. at 994–95, 108 S.Ct. 2777. Showing causation is central to success on this claim;

merely showing that "there is a bottom line racial imbalance is insufficient." *Brown v. Coach Stores Inc.*, 163 F.3d 706, 712 (2d Cir.1998). Generally, plaintiffs rely on statistical proof which must show that the disparity is significant or substantial and that it is caused by the challenged employment practice. *Bouman v. Block*, 940 F.2d 1211, 1225 (9th Cir.1991).

■ If plaintiffs succeed in making a prima facie case, the burden shifts to the defendant employer to show either that plaintiffs' statistical evidence is flawed, that the challenged employment practice did not cause the disparity, or that the challenged practice is job related and consistent with a business necessity. § 2000e–2(k); *Robinson*, 267 F.3d at 161 (citing *In re Employment Discrimination Litig.*, 198 F.3d 1305, 1313 (11th Cir. 1999)). To show a business necessity for a policy or practice of granting discretion, the employer "would have to argue that the subjectivity of the [challenged practice] is job-related—in other words, that something about the position requires the selector to make a subjective evaluation of the applicant's abilities." *Mozee v. Am. Commercial Marine Serv. Co.*, 940 F.2d 1036, 1050 (7th Cir.1991).

If the defendant employer succeeds in showing that it has a business necessity justifying the practice, the burden shifts back to plaintiffs to show that there are alternative policies or practices that would satisfy the business necessity but without causing the disparate impact. § 2000e–2(k); *Robinson*, 267 F.3d at 161. If plaintiffs ultimately prevail, the court may then fashion injunctive relief.

As in pattern or practice disparate treatment claims, if plaintiffs seek back pay, the case then enters a remedial phase in which each plaintiff must show that he or she was adversely affected by the challenged practice. Defendant employer can rebut by showing that a legitimate non-discriminatory reason existed for the adverse action. *Id.* at 162.

■ Many of the same arguments and evidence discussed above apply regarding manageability of the liability and remedial phases. There is one key difference howev-

er. The 1991 amendments to Title VII provided for the right to a jury trial when plaintiffs allege disparate treatment and seek punitive or compensatory damages. Plaintiffs have requested a jury trial. This difference has important manageability implications when plaintiffs allege both disparate treatment and disparate impact. When a factual question is common to both legal and equitable claims in the same action, the jury must make its factual findings on the legal claim before the court can rule on the equitable claim. *Dairy Queen, Inc. v. Wood,* 369 U.S. 469, 472–73, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962); *Beacon Theatres, Inc. v. Westover,* 359 U.S. 500, 510–11, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959). Therefore, when a disparate treatment claim seeking punitive damages is pled with a disparate impact claim, both claims may be tried at the same time, but the Court will not make any factual findings on the disparate impact claim until the jury has made its findings on the disparate treatment claim. For any overlapping factual issues, the Court must adhere to the jury's findings.

The Court certifies the liability phase and the injunctive relief portion of the remedial phase of the disparate impact claim. As discussed above, the Court will withhold ruling on the back pay portion of the remedial phase until the conclusion of the liability phase.

## CONCLUSION

The Court GRANTS Plaintiffs' motion in part and certifies the following class:

> African–American salaried employees employed by Heritage Boeing from June 6, 1994 to the present, excluding executives and SPEEA Techs, seeking injunctive relief for racial discrimination in compensation and promotions.

Certification of subclasses of the African–American hourly employees' promotions claim may be appropriate. However, based on the record, the Court cannot determine what the appropriate subclasses might be. Therefore, the Court DENIES without prejudice certification of the African–American hourly employees' promotion claim.

It is further ordered that the litigation of the disparate treatment and disparate impact claims under Title VII will be bifurcated into a liability phase and a remedial phase. This order certifies only the liability phase and the injunctive relief portion of the remedial phase.

The liability phase will consist of a jury trial to determine liability on the disparate treatment claim and a bench trial to determine liability on the disparate impact claim. If liability is found on either claim, the Court will then order injunctive relief as necessary.

If liability is found under either claim, the Court will revisit the question of certifying the back pay and punitive damages portions of the remedial phase.

The clerk is directed to provide copies of this order to all counsel of record.